## YAZOO AND MISSISSIPPI VALLEY RAILWAY CO. *v.* ADAMS.

ERROR TO THE SUPREME COURT OF THE STATE OF MISSISSIPPI.

No. 35. Argued October 22, 23, 1900.—Decided January 7, 1901.

An action was begun in a state court for taxes. Defendants pleaded in bar, but did not set up a Federal question. The case resulted in a judgment for a part of the taxes; was carried to the Supreme Court which passed upon all the issues, reversed the judgment, and practically held that defendants were liable for all the taxes, and remanded the case for a new trial. Defendants then set up a Federal question, which the court upon the new trial refused to consider, and the Supreme Court affirmed its action. *Held* that the Federal question was "specially set up and claimed" too late to be available as a defence.

As it appeared from the record in this case and the opinion of the court, that the defendants relied upon certain charter rights, which they insisted had been impaired by subsequent legislative action; and the Supreme Court held that no such rights existed, it was *held* that it sufficiently appeared that there was a Federal question necessarily involved in the case, and not only must have been, but actually was, passed upon by the Supreme Court.

It is only cases arising under the third clause of Rev. Stat. sec. 709, where a Federal right, title, privilege or immunity is claimed, that the question must be specially set up. Under the second clause it is sufficient, if the validity of a state statute or authority is necessarily involved in the disposition of the case.

The Mississippi constitution of 1890 provided that every new " grant of corporate franchises " should be subject to the provisions of the constitution. Where several railroads were consolidated, subsequent to the adoption of this constitution, by a contract, under which the constituent companies were to go out of existence, their officers to resign their trusts in favor of officers of the new company, their boards of directors supplanted by another board, the stock of the constituent companies to be surrendered and new stock taken therefor, or, in lieu of that, that the old stock should be recognized as the stock of the new company, and that the road should be operated by men holding their commissions from the new company, it was *held* that a new grant of corporate franchises had been made, and the consolidated company was subject to the new constitution.

Where two companies agree together to consolidate their stock, issue new certificates, take a new name, elect a new board of directors, and the constituent companies are to cease their functions, a new corporation is thereby formed subject to existing laws.

THIS case originated in an action at law begun December 7, 1893, in the circuit court for the first district of Mississippi, by Wirt Adams, revenue agent, suing for the use of the State and of the counties through which the defendant railways pass, against the Yazoo and Mississippi Valley Railroad Company, incorporated under an act of the legislature of Mississippi of February 17, 1882, and also against the Illinois Central Railroad Company, as successors in interest by consolidation, of a number of other railways, to recover taxes assessed by the railroad commission of that State for the year 1892.

Exhibits annexed to the declaration showed that the Yazoo and Mississippi Valley Railroad Company, as now constituted, was the result of a consolidation made October 24, 1892, between a company of the same name, chartered as above stated, February 17, 1882, and the Louisville, New Orleans and Texas Railway Company, which latter company was itself formed by a consolidation made August 12, 1884, of the Tennessee Southern Railroad Company, the Memphis and Vicksburg Railroad Company, the New Orleans, Baton Rouge, Vicksburg and Memphis Railroad Company, and the New Orleans and Mississippi Valley Railroad Company.

On December 27, 1893, a plea was filed by the Illinois Central Railroad Company, denying certain of the allegations in

the declaration; and a separate plea was filed by the Yazoo and Mississippi Valley Railroad Company, claiming in its own favor the benefit of the charter of the Louisville, New Orleans and Texas Railroad Company exempting such company from the assessment of these taxes by reason of the payment of the same in the construction of its road, and also denying material allegations of the declaration. No Federal question appeared in either of these pleas. A demurrer to these pleas having been overruled, replications were filed.

On December 18, 1894, another action was begun against the same defendants for the taxes of 1893 and 1894, and on January 1, 1896, another for the taxes of 1895. An order was made consolidating these actions.

The three cases thus consolidated came on for trial before a jury and resulted in a verdict and judgment, July 25, 1896, in favor of the plaintiff for the taxes of 1895, and in favor of the defendants for the taxes of 1892, 1893 and 1894. Both parties moved for a new trial, which was denied. Both parties appealed to the Supreme Court, but neither assigned a ruling upon a Federal question as error. The Supreme Court reversed the judgment of the court below and remanded the case for a new trial. 77 Mississippi, 194. The court, June 20, 1898, filed a summary of its holdings to the effect, first, that the case of the *Natchez, Jackson &c. Railroad Company* v. *Lambert*, 70 Mississippi, 779, which apparently had been set up as *res judicata*, was an estoppel only as to taxes for the year 1892, on property originally belonging to the Natchez, Jackson and Columbus Railroad Company in Adams County, but not upon other property, or as to the taxes for other years; second, that the Yazoo and Mississippi Valley Railroad Company was a new corporation taking its life from the date of the consolidation, and overruling the *Lambert* case to the contrary; third, that the twenty-first section of the Mobile and Northwestern Railroad Company's charter was an effort to secure an irrepealable grant of exemption, was in violation of the constitution of 1869, and that it would have been a violation even if it had not been irrepealable; and the case of *Mississippi Mills* v. *Cook*, 56 Mississippi, 40, to the contrary was overruled. 77 Mississippi, 305.

A motion to strike out this "summary of holdings" was denied November 28, 1898. 77 Mississippi, 302.

Meantime two new actions had been begun in the circuit court for the taxes of 1896 and 1897, which were also consolidated with the others.

On July 4, 1898, the mandate of the Supreme Court reversing the judgment of the court below was filed in the circuit court. Meantime, however, and on June 27, 1898, defendants filed a petition and bond for a removal of the cause to the Circuit Court of the United States upon the ground that the case arose under the Constitution and laws of the United States. This petition was also denied July 4, upon the day the mandate was filed.

Thereupon each of the defendants, July 6, 1898, filed special pleas to the declaration, setting forth at great length the exemption claimed under the charters of their constituent companies, and alleging that such exemption constituted a contract which had been impaired by the action of the State. Motion was made by the plaintiff to strike out certain of these pleas, viz., the third, fourth, fifth, sixth and seventh, as constituting no defence to the action, which was granted by the court, and all of such pleas, except the seventh, which was withdrawn, were stricken from the files. Whereupon the defendants, "to meet the new aspect put upon the case by the decision of the Supreme Court herein rendered on June 20, 1898," withdrew "their joint plea filed by them prior to such decision, and all other pleas filed before that decision," and also withdrew the two pleas filed by them respectively at this term, (No. 2,) and declined to plead further herein. They did not, however, withdraw the pleas which had been stricken out by the court. A judgment was entered the same day *nil dicit* against the defendants for the amount sued for in said consolidated case, amounting in all to $548,676.99. The case was again appealed to the Supreme Court and a new opinion rendered February 20, 1899, reiterating its former views and affirming the judgment of the court below. 77 Mississippi, 315. Whereupon defendants sued out this writ of error.

*Mr. William D. Guthrie* and *Mr. Edward Mayes* for plaintiffs in error. *Mr. James Fentress, Mr. Noel Gale* and *Mr. J. M. Dickinson* were on their brief.

*Mr. R. C. Beckett* for defendant in error. *Mr. Frank A. Critz* and *Mr. J. A. P. Campbell* were on his brief.

MR. JUSTICE BROWN, after making the above statement of the case, delivered the opinion of the court.

Motion was made to dismiss this writ of error upon the grounds: First, that the Federal question was not raised until after the decision of the Supreme Court on June 20, 1898. Second, that the action of the defendants in withdrawing their pleas and permitting a judgment *nil dicit* to go against them, because the circuit court had struck from the files their additional pleas attempting to set up a Federal question, was an admission that they had no defence upon the facts of the case, and deprived them of any right to insist upon a Federal question. Third, that the petition for removal was not made until after the case had been tried in the state Supreme Court, and reversed and remanded. No claim of error in the action of the state court in this last particular was made in this court. Indeed, the point seems to have been abandoned. Fourth, that the decision of the state Supreme Court on the first appeal, that the alleged exemption, if it existed at all, was lost by the consolidation of October 24, 1892, raised no Federal question. Several other reasons are assigned for the motion, but they are either addressed to the merits of the case, or become immaterial in the view we have taken of those herein specified.

1. Was the Federal question raised too late? The special pleas setting up distinctly the Federal question were filed after the case had been decided by the Supreme Court, its mandate had gone down to the circuit court, and the case was ready for a new trial. As already stated, certain of these pleas were stricken out upon motion of the plaintiff as constituting no defence to the action, and all the pleas, except such as had been stricken out by the court, were then withdrawn, and a judg-

ment *nil dicit* entered.   On the case being again carried to
the Supreme Court, that court held that the action of the court
below " in striking out the special pleas was correct, for the
obvious reasons that they presented no defence to the action,
in whole or in part.   The former opinion of the court in this
case settled definitely and conclusively all the issues involved,
and the special pleas are in effect nothing else than an effort
to have the circuit court disregard that opinion.   The futility
of that sort of pleading needs no sort of comment.   These mat-
ters of practice and procedure, and all the other assignments of
error touching matters of practice and procedure, were correctly
settled by the court.   The former opinion of the court in this
cause, and its opinion on the motion to strike that opinion from
the files, disposed effectively of such of these matters as are not
here specifically adverted to."   77 Mississippi, 315.

It is very evident that the circuit court, in striking out these
pleas, took the view that the Supreme Court had, upon the first
hearing, settled the law to be that no valid contract of exemp-
tion existed, and that if such contract existed in favor of the
Louisville, New Orleans and Texas Railway Company (herein-
after styled the Louisville Company) it had been lost by the
consolidation of October 24, 1892, and that the only effect of
the special pleas was to inject a claim under the Federal Con-
stitution as an argument for reversing its ruling.   These pleas
evidently raised precisely the same questions that had been set-
tled in a slightly different form.   The circuit court treated
this as an attempt to induce it to overrule the action of the Su-
preme Court, which of course was impossible.   The Supreme
Court not only held that the circuit court was correct in this
view, but that the issues having already been settled, it would
itself treat them as *res judicata*.   This accords with what seems
to be the uniform practice of the Mississippi courts.   Thus, in
*Smith* v. *Elder*, 14 S. & M. 100, it was held that where a de-
murrer to a plea, which had been sustained in the court below,
was overruled by the Supreme Court, all the legal questions
raised by the demurrer would be considered as having been
settled by the decision overruling it; and that such decision
would not only be binding upon the inferior but also upon the

appellate court.. So also in *Bridgeforth* v. *Gray*, 39 Miss. 136, it was held that, where the construction of a will had been settled upon demurrer to a bill in chancery, the court would not permit that question to be reopened upon a hearing upon the merits, notwithstanding the chancery court of Tennessee in the mean time had placed a different construction upon the will. This is also the rule in this court. *Supervisors* v. *Kennicott*, 94 U. S. 498; *The Lady Pike*, 96 U. S. 461; *Thompson* v. *Maxwell Land Grant & Railway Co.*, 168 U. S. 451. See also *Hook* v. *Richeson*, 115 Illinois, 431; *Brooklyn* v. *Orthwein*, 140 Illinois, 620; *McKinney* v. *State*, 117 Indiana, 26.

In this aspect the case is much like that of *The Mutual Life Insurance Co.* v. *Kirchoff*, 169 U. S. 103. In that case the insurance company had loaned money to Kirchoff and had filed a bill to foreclose the trust deed. Pending this bill an agreement was entered into for the release to Kirchoff of two of the lots embraced in the foreclosure proceedings, but it was agreed that these proceedings should be prosecuted, and as soon as the company obtained a deed from the master, it would convey to Kirchoff. No defence was made to the foreclosure, and the case went to a decree and the property was sold. The case went to the Supreme Court of Illinois, which found the agreement between Mrs. Kirchoff and the insurance company as claimed by her; determined that she was entitled to the release sought, and remanded the case for the purpose of an accounting. As stated by the Chief Justice: "The record does not disclose that any right or title was specially set up or claimed under any statute of, or authority exercised under, the United States in the courts below, or in the Supreme Court of Illinois prior to the decision of the latter court on the first appeal. . . . The errors there assigned nowhere in terms raised a Federal question. And in affirming the judgment of the appellate court the Supreme Court did not consider or discuss any Federal question as such in its opinion.". It appears to have turned upon questions of fact. "It is now contended that it then appeared that defendant claimed to hold an absolute title to the lots in question by virtue of the foreclosure proceedings and of the master's deed obtained thereunder, and hence that the title was claimed un-

der an authority exercised under the United States; that a
Federal question was thereby raised on the record; and that
the decision of the case necessarily involved passing on the claim
of title." Upon the second appeal, it was assigned as a Federal
question that the circuit court erred in entering a decree which
would in effect nullify the decree of foreclosure of the Circuit
Court of the United States, and in refusing to the defendant
leave to file the proposed amendment to its answer. "The ap-
pellate court on the second appeal held itself bound by the pre-
vious decision, and declined to enter on matters of defence which
might have been availed of. The Supreme Court was of the
same opinion, for it ruled that where a case which once had
been reviewed by the court, and remanded with directions as
to the decree to be entered, error could not be assigned on a
subsequent appeal for any cause existing at the time of the prior
judgment." This court dismissed the writ of error, holding
that, as the Supreme Court did not reopen the case as to matters
previously adjudicated, and as the Federal question was not
set up upon the first appeal, there was no action of that court
in relation to it which we were called upon to revise. See also
*Northern Pacific Railroad* v. *Ellis,* 144 U. S. 458; *Great West-
ern Tel. Co.* v. *Burnham,* 162 U. S. 339.

It is true that in the suit under consideration the case was
not formally sent back for an accounting, but it was practically
so, since all the questions of law had been settled upon the first
appeal beyond the power of the circuit court to reopen, and
upon the remand that court could do nothing else than enter
judgment for the taxes of 1892, 1893 and 1894, as well as for
the taxes of 1895. The Supreme Court, in deciding that it
would not reopen the question involved upon the first hearing,
to let in the Federal defence presented by the new pleas, merely
settled a question of practice which we cannot review.

By another process of reasoning we are led to the same con-
clusion. No leave was applied for or granted to file these ad-
ditional pleas after the issues had been made up, as seems to
be required by the practice in Mississippi, where it is said that
all such pleas must be presented, with the application to file
them to the court, that it may judge of the propriety of the pro-

posed action, *Hunt* v. *Walker*, 40 Mississippi, 590; *Pool* v. *Hill*, 44 Mississippi, 306; *Pfeifer* v. *Chamberlain*, 52 Mississippi, 89, 90; and even if leave had been asked to file them, it was a matter of discretion with the trial court to permit it, and a matter of state practice which cannot be inquired into here. *Stevens* v. *Nichols*, 157 U. S. 370; *Mexican Central Railway Co.* v. *Pinckney*, 149 U. S. 194, 199; *Long Island Water Co.* v. *Brooklyn*, 166 U. S. 688. We are therefore of opinion that the Federal question was "specially set up and claimed" too late to be of any avail to the plaintiffs in error.

2. But the very arguments urged upon us by the defendant in error for holding that the Federal question was set up too late, as well as the reasons given for affirming the decree of the court in striking out the additional pleas, furnish a strong argument in favor of the position assumed by the railroad companies, that the Federal question was necessarily involved and must have been passed upon at the first hearing. This argument is in substance that the pleas were properly stricken out, because they presented no defence as the case then stood, by reason of the decision of the Supreme Court on the first appeal. 77 Mississippi, 194, 237.

In order to ascertain exactly what was in issue and what was decided by the Supreme Court, it is necessary to set forth the facts at some length. The original declaration averred the several consolidations by which the defendant companies were formed; the assessment of the same for taxation by the railroad commission; a copy of the assessment by counties; and the refusal to pay. Annexed thereto as exhibits were copies of the various charters and contracts of consolidations.

Underlying all the questions in the case are the following provisions of the constitution of 1869:

"Article 12, section 13. The property of all corporations for pecuniary profits shall be subject to taxation the same as that of individuals."

"Section 20. Taxation shall be equal and uniform throughout the State. All property shall be taxed in proportion to its value, to be ascertained as directed by law."

By the twenty-first section of an act to incorporate the Mobile

and Northwestern Railroad Company, approved July 20, 1870, the State "hereby agrees with said company (and which agreement is irrepealable) that all taxes to which said company shall be subject for the period of thirty years, are hereby appropriated and set apart, and shall be applied to the debts and liabilities which the said company may have incurred in the construction of said road, or for money borrowed by said company, upon lands or otherwise, to be used in constructing said road, or paying debts incurred by said company, in constructing the same. . . . *Provided, however*, That whenever the profits of said company shall enable it to declare and pay to the stockholders an annual dividend of eight per cent upon its capital stock over and above the payment of its debts and liabilities, then the appropriation of the taxes aforesaid shall cease, and said taxes shall be paid by said company to the tax collector, to be by him paid over as required by law."

By an act of August 8, 1870, the provisions of this section were extended to the Memphis and Vicksburg Railroad, the Natchez and Jackson Railroad, and a number of others not necessary here to be mentioned.

The Memphis and Vicksburg Railroad Company was incorporated the same day, August 8, 1870. The sixteenth section of this act enacted "that said company shall have the right and power to consolidate the stock, property and franchises of the road with any other road or roads, in or out of this State, at any time the president and directors of the road may deem proper, and upon such terms as may be consistent with the powers conferred upon said company."

By an act to incorporate the New Orleans, Baton Rouge, Vicksburg and Memphis Short Line Railroad Company, (hereinafter called the Baton Rouge Company,) approved March 9, 1882, it was enacted, sec. 25: "That the company shall have power and authority to purchase and hold any connecting railroad, and to operate the same or to consolidate the company with any other company under the name of one or both; but when such purchase is made, or consolidation is effected, the said company shall be entitled to all the benefits, rights, fran-

chises, lands and property of every description belonging to said road or roads so sold or consolidated."

Both these two last-mentioned companies were consolidated by an agreement made August 12, 1884, into the Louisville, New Orleans and Texas Railway Company.

By an act approved March 3, 1882, and an act amendatory thereto of March 15, 1884, the Memphis and Vicksburg Road was authorized to consolidate with any other company or companies, " whether such company or companies have been incorporated under the laws of this State or of any other State, so that all of the companies so consolidating shall be merged into and become one company ; and the company so formed by such consolidation shall be deemed and held to be a corporation created by the laws of this State, and shall have, enjoy and possess all the rights, ways, privileges, franchises, property, grants and immunities, which are now possessed by the companies which may enter into such consolidation, as fully as though the same were conferred specially in this act."  Another section (5) applied the twenty-first section of the Mobile and Northwestern charter to the company so consolidated.

By a further act of February 17, 1882, the Yazoo and Mississippi Valley Railway Company (hereinafter called the Yazoo Company) was authorized " to consolidate with any other railroad company in or out of Mississippi upon such terms as the consolidating companies might agree upon, . . . and upon any such consolidation the said consolidated company shall have and enjoy all the property, rights, privileges, powers, liberties, immunities and franchises herein granted ; but such consolidation shall not have the effect of exempting from taxation the railroad or property owned by such other consolidating company prior to its consolidation with the company hereby chartered ; nor of exempting from taxation any property which the consolidated company may, after such consolidation, acquire under the provisions of the charter of such other consolidated company."  Finally by the act of February 19, 1890, the Louisville, New Orleans and Texas Company, and the Natchez, Jackson and Columbus Company were authorized to consolidate with each other under the name of the. Louisville, New

Orleans and Texas Company, and upon such terms as might be agreed upon by the companies.

In 1890 the State adopted a new constitution, the following clauses of which only are pertinent:

" SEC. 180. All existing charters or grants of corporate franchises under which organizations have not in good faith taken place at the adoption of this constitution, shall be subject to the provisions of this article," etc.

" SEC. 181. The property of all private corporations for pecuniary gain shall be taxed in the same way and to the same extent, as property of individuals, etc. Exemptions from taxation, to which corporations are legally entitled at the adoption of this constitution, shall remain in full force and effect for the time of such exemptions as expressed in their respective charters, or by general laws, unless sooner repealed by the legislature."

On October 24, 1892, articles of consolidation were entered into between the Louisville Company and the Yazoo Company, the effect of which will hereafter be considered.

By the Code of Mississippi of 1892, section 3875, a system of taxing the property of railroad companies by the railroad commission was put in force. This article provided for a complete schedule of the property of the company, the total amount of its capital stock, its par value and the value of its franchise; and, by a law subsequently enacted, February 7, 1894, a state revenue agent was provided for, whose duty it was to enforce the payment of taxes by all classes of property owners. It was under the provisions of the laws of 1892 that this action was begun.

The railroad companies went to a trial of these cases in an obvious reliance upon two previous decisions of the Supreme Court of Mississippi. In the first one, (*Mississippi Mills* v. *Cook,* 56 Miss. 40,) that court held the constitutional provision, that " the property of all corporations for pecuniary profits shall be *subject* to taxation," did not require that such corporations must always be *subjected* to taxation, but that their property could not be placed beyond the reach of the taxing power; and that the legislature might exempt property of a particular class, whether the owners were corporations or natural persons

—in other words, that the provision was *mandatory* as to the liability of such property to be taxed, but *permissive* to the legislature to tax it or exempt it, as might seem proper. It further held that the provision of section 20, that "all property shall be taxed in proportion to its value," did not require that *all* property should be taxed, or deny to the legislature the right to exempt any; that the legislature might exempt property of a certain class, or property used for a certain purpose; that it had the power to select such objects of taxation as it might deem appropriate; but when any article of property was selected for taxation, it must be taxed in proportion to its value, and not specifically.

In the second case, *Railroad Company* v. *Lambert*, 70 Mississippi, 779, that court held the exemption in the twenty-first section of the charter of the Mobile and Northwestern Railroad was one which the legislature had power to confer, but not to make irrepealable; that under the acts of August 8, 1870, and March 5, 1878, this immunity from taxation was extended and confirmed to the Natchez, Jackson and Columbus Railroad Company, and by the act of February 19, 1890, authorizing a consolidation with the New Orleans, Louisville and Texas Company, the latter company by its consolidation acquired the immunities of the former company, and was entitled to the same exemption from taxation; also, that after the consolidation of the Louisville Company with the Yazoo Company, the latter succeeded to the same immunity from taxation on that part of its lines which formerly comprised the Natchez, Jackson and Columbus Railroad. In short, these cases cover practically every point involved in the case under consideration, and counsel evidently acted upon the theory that it was unnecessary to specifically set up and claim that there was a contract for exemption which the legislature had subsequently impaired.

But upon the hearing of the case under consideration the court (now differently constituted) overruled both of these cases, and held, first, that the legislature could not grant an exemption to a railway company under the constitution of 1869; second, that it could not grant an irrepealable exemption under that constitution; third, that a new company was formed by

the consolidation of October 24, 1892, and no exemption passed into it; fourth, that if the consolidation were a technical merger, still section 180 of the constitution of 1890 prevented any exemption from passing into it; fifth, that any such exemption was repealed by the acts of 1884, 1886 and 1890. Manifestly, that court could not have held the railways liable for the taxes in suit without deciding either that the provision of section 21 did not constitute a legal contract in view of the constitution of 1869, or that no such contract existed in favor of the plaintiffs in error in view of the consolidations, or that the subsequent tax legislation of the State of 1892 and 1894 did not impair the obligation of that contract. All these were Federal questions, the vital one being whether the acts of 1892 and 1894 impaired the obligation of the contract, if any existed.

In short, the case is one of those frequently arising under the second clause of Rev. Stat. section 709, in which the validity of a state statute under the Constitution of the United States is necessarily drawn in question, and the decision of the state court being in favor of its validity, this court will take jurisdiction, though the Federal question be not specially set up or claimed. As we have repeatedly had occasion to hold, it is only in cases arising under the third clause of the section where a right, title, privilege or immunity is claimed, that the Federal question must be specially set up. The cases are collected in *Columbia Water Power Company* v. *Columbia Electric Street Railway Company*, 172 U. S. 475, 488. Thus, in *Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245, the record did not show that the constitutionality of an act of a state legislature was drawn in question; "but," said the Chief Justice, "we think it impossible to doubt that the constitutionality of the act was the question, and the only question, which could have been discussed in the state court." So, in *Satterlee* v. *Matthewson*, 2 Pet. 380, it was said that if it sufficiently appear from the record itself that the repugnancy of the statute of a State to the Constitution of the United States was drawn in question, this court has jurisdiction, though the record does not in terms declare that this question was raised. See also *Crowell* v. *Randell*, 10 Pet. 368; *Furman* v. *Nichol*, 8 Wall. 44; *Chicago Life Ins. Co.* v. *Needles*, 113

U. S. 574; *Eureka Lake &c. Co.* v. *Yuba County,* 116 U. S. 410; *Kaukauna Co.* v. *Green Bay & Mississippi Canal,* 142 U. S. 254. And the fact that the Supreme Court of the State did not expressly refer to the contract clause of the Constitution does not prevent our taking jurisdiction, if the applicability of such clause were necessarily involved in its decision. As was said by Chief Justice Waite in *Chapman* v. *Goodnow,* 123 U. S. 540, 548: "If a Federal question is fairly presented by the record, and its decision is actually necessary to the determination of the case, a judgment which rejects the claim, but avoids all reference to it, is as much against the right, within the meaning of section 709 of the Revised Statutes, as if it had been specifically referred to and the right directly refused."

The decision of the Supreme Court that the exemption in the Mobile and Northwestern Railroad Company's charter of 1870 was void under the constitution of 1869 was practically a decision that the contract of the State was beyond the power of the legislature and void, and hence there was no contract to be impaired. But conceding this contract to have been valid, another distinct question arose, whether that contract enured to the benefit of the plaintiffs in error by the successive consolidations—in other words, whether, as to the plaintiffs in error, there was any contract ever existing which the taxing legislation of Mississippi could impair. Both these questions were ruled against the railroads; and while the contract clause of the Federal Constitution was not discussed, the case turned upon the existence of such a contract, and no question seems to have been made that, if there had been a contract, it was impaired by the taxing legislation of 1892. As we have often held, that where an impairment of a contract by state legislation is charged, the existence or non-existence of the contract is a Federal question, it is impossible to escape the conclusion that the foundation of the whole case was, whether there was really a contract which had been impaired, and that this was necessary to the determination of the case. As already stated, this was a Federal question, and the fact that the Supreme Court did not in terms discuss the contract clause of the Constitution does not oust our jurisdiction. In view of this record and the opinions

of the Supreme Court, the certificate of the Chief Justice, that the validity of the state statutes was actually drawn in question under the contract clause of the Constitution, was but a further assurance of a fact already appearing. The motion to dismiss must therefore be denied.

3. At the foundation of the right to a reversal of this case is the question whether, conceding the validity of the exemption or commutation provision contained in the twenty-first section of the Mobile Company's charter of July 21, 1870, such exemption enured to the plaintiffs in error under their successive consolidations. It will be borne in mind that the existing constitution of Mississippi was adopted November 1, 1890; that the present Yazoo Company was formed October 24, 1892, (nearly two years after the adoption of the constitution,) by the consolidation of the original Yazoo Company with the Louisville Company. By the act of August 8, 1870, the exemption contained in the twenty-first section of the Mobile charter was extended to the Memphis and Vicksburg Railroad, which was chartered the same day. This charter gave it power to consolidate its stock, property and franchises with any other road upon such terms as might be consistent with the powers conferred upon the company. Twelve years thereafter, March 9, 1882, the Baton Rouge Company was incorporated with power to consolidate with any other company, and on March 3, 1882, the Memphis and Vicksburg Company was also authorized to consolidate. The same power had already been extended February 17, 1882, to the Yazoo Company.

It is unnecessary to discuss the terms of the first consolidation of August 12, 1884, between the Tennessee Southern, the Memphis Company, the Baton Rouge Company, and the New Orleans Company, forming the Louisville, New Orleans and Texas Company, since this was made prior to the adoption of the new constitution of 1890. We are specially concerned with the articles of consolidation between the Louisville Company, so organized, and the Yazoo Company, which were adopted October 24, 1892, and subsequent to the new constitution. The question in that connection is whether such consolidation created a new corporation, or, in the language of section 180 of the con-

stitutior of 1890, whether it was a "grant of corporate franchises," in which case, by the express language of that section, such new corporation became subject to the provision of the new constitution. In their articles of consolidation these companies agreed " to and with each other, to unite, merge and consolidate their several capital stocks, corporate rights, franchises, immunities and privileges, and properties of every kind, real, personal and mixed." The first article provided that " such consolidation shall be effected by uniting or merging the stock, property and franchises of the party of the first part, (the Louisville Company,) with and into the stock, property and franchises of the said the Yazoo and Mississippi Valley Railroad Company, without disturbing the corporate existence of the last-named company, or the formation of any new, distinct corporation, unless such result shall be necessary to give legal effect to this agreement; but whatever may be the legal consequence of the consolidation herein provided for, this agreement is to stand and be effective." This article was evidently drawn in view of the decisions of this court upon the subject of merger and consolidation, and evinces a desire to avoid the legal results following from a consolidation of the two constituent companies into a new corporation, but, at the same time, expresses a doubt whether the agreement would not after all be construed to create a new corporation. These doubts were unquestionably well founded, and if the effect of the agreement be in law the creation of a new corporation, the expression of a wish that it should not be so construed, is of course entitled to no weight. The final clause, that in any event the agreement shall stand and be effective, shows that effect should be given to all its stipulations, whatever be its legal consequences.

Subsequent articles provided that the corporate name should be the Yazoo and Mississippi Valley Railroad Company; that the capital stock should be fifteen million dollars; that the stockholders of either of the constitutent companies should " have all the rights of a stockholder of the consolidated company, as fully as if new shares of the consolidated company had been issued and exchanged therefor; and in case the consolidated company shall determine to issue new shares, such shares shall be exchangeable

at par for the now outstanding shares of each of the constituent companies ; " that all the rights, powers, privileges, immunities and franchises of the constituent companies should pass to the consolidated company, which should be managed by a board of directors, whose names, for the purpose of the organization, were given.

Reading this agreement in connection with the charters of the several companies, and especially with that of the Memphis and Vicksburg Railroad Company of March 3, 1882, providing that "all of the companies so consolidating shall be merged into and *become one company*, and the company so formed by such consolidation shall be deemed and held to be *a corporation* created by the laws of this State," it is impossible to escape the conclusion that a new corporation was created with a capital stock of fifteen million dollars, and that the stockholders of the constituent companies were to become stockholders of the new company, share for share, "as fully as if new shares of the consolidated company had been issued and exchanged therefor." Some question was made in the state courts whether the shares were actually issued in the new company. But the Supreme Court having found that they were, we accept that finding as conclusive. Power was expressly given to issue new shares, and the usual course of business would justify us in inferring that that was the method adopted. A new name was taken, which was none the less a new one by reason of the fact that it was the name of one of the constituent companies.

It cannot be doubted that under this agreement it was contemplated that the constituent companies should go out of existence, and that their officers should resign their trusts in favor of the officers of the new company; that their boards of directors should be supplanted by another board, the names of whose members were contained in the agreement; that the stock of the constituent companies should be surrendered and new stock taken therefor, or, in lieu of that, that the old stock should be recognized as the stock of the new company ; that the road should be operated by men holding their commissions from the new company, and that the entire administration of the functions of the constituent companies should be surrendered to the

new corporation.  In short, nothing was left of the constituent companies but the memory of their existence—the mere shadow of a name.  But the new company which took their place suddenly sprang into life with a new corps of officers and a full equipment for the successful operation of the road.

While as stated in *Tomlinson* v. *Branch*, 15 Wall. 460, the presumption is that when two railroads are consolidated each of the united lines will be respectively held with the privileges and burdens originally attaching thereto, subsequent cases have settled the law that where two companies agree together to consolidate their stock, issue new certificates, take a new name, elect a new board of directors, and the constituent companies are to cease their functions, a new corporation is thereby formed subject to existing laws.  But if, as was the case in *Tomlinson* v. *Branch*, one road loses its identity and is merged in another, the latter preserving its identity, and issuing new stock in favor of the stockholders of the former, it is not the creation of a new corporation but an enlargement of the old one.  In such case it was held that where the company which had preserved its identity held as to its own property a perpetual exemption from taxation, it would not be extended to the property of the merged company without express words to that effect.

In the earliest of these cases, *Philadelphia, Wilmington &c. Railroad* y. *Maryland*, 10 How. 376, it was held that a Maryland railroad, whose charter contained no exemption from taxation, did not acquire such exemption by consolidation with the Delaware and Maryland Railroad Company, whose charter exempted the road from taxation, except upon that portion of the permanent and fixed works which might be in the State of Maryland.

In *Central Railroad & Banking Company* v. *Georgia*, 92 U. S. 665, 670, an act of the legislature authorized the Central Railroad and the Macon Railroad to unite and consolidate their stock, and all their rights, privileges, immunities and franchises, under the name and charter of the Central Railroad, in such manner that each owner of shares of stock of the Macon Road should be entitled to receive an equal number of shares of the stock of the consolidated companies.  " Whether," said Mr. Jus-

tice Strong, " such be the effect [consolidation or amalgamation] or not, must depend upon the statute under which the consolidation takes place, and of the intention therein manifested. If, in the statute, there be no words of grant of corporate powers, it is difficult to see how a new corporation is created." It was held that the act did not work a dissolution of the existing corporations and the creation of a new company, since there was no provision for a surrender of the stock of the shareholders of the Central, and none for the issue of other certificates to them. In that case, the road, whose charter contained the exemption from taxation, was preserved intact by the consolidation, and it was held that its exemption continued, while the other road was to go out of existence. As already stated, in the act authorizing the consolidation in this case of the Memphis and Vicksburg Railroad Company, there is an express provision that all the companies so consolidated shall be merged into and become *one company*, and held to be a corporation created by the laws of the State.

Other cases to the same effect, holding that the consolidation did not operate as a dissolution of the constituent companies, are *Chesapeake & Ohio Railroad* v. *Virginia*, 94 U. S. 718; *Greene County* v. *Conness*, 109 U. S. 104, and *Tennessee* v. *Whitworth*, 117 U. S. 139.

It may be observed that all these cases turn upon the question whether the new company inherited by consolidation certain privileges and immunities belonging to the constituent companies, or one of them, and that no question arose as to the applicability of a new constitutional inhibition intervening before the consolidation took place. This question, however, did arise in *Shields* v. *Ohio*, 95 U. S. 319, where it was held that a consolidation under a statute of Ohio of two or more railroad companies worked their dissolution, and that the powers and franchises of the new company thereby formed were subject to " be altered, revoked or repealed by the General Assembly " under a constitutional provision which took effect prior to the consolidation. The statute in that case expressly provided that the consolidated company should be a new corporation and subject to the constitutional provision. A like ruling was made

under a similar statute of Maine in *Railroad Company* v. *Maine*, 96 U. S. 499.   In *Railroad Company* v. *Georgia*, 98 U. S. 359, two railroad companies were consolidated by an act of the legislature, which authorized the consolidation of their stocks, conferred upon the consolidated company full corporate powers, and continued to it the franchises, privileges and immunities which the companies had held by their original charters.   We held in that case that a new corporation was created, which became subject to the provisions of a statutory code, adopted January 1, 1863, permitting the charters of private corporations to be changed, modified or destroyed at the will of the legislature.   The case was distinguished from *Railroad Company* v. *Georgia*, 92 U. S. 665, as being a consolidation instead of a merger.   "Nor was it," said Mr. Justice Strong, "a mere alliance or confederation of the two.   If it had been, each would have preserved its separate existence as well as its corporate name; but the act authorized the consolidation of the stocks of the two companies, thus making them one company in place of two.   It contemplated, therefore, that the separate capital of each company should go out of existence as the capital of that company."   To the same effect is *St. Louis, Iron Mountain &c. Railway* v. *Berry*, 113 U. S. 465.

The latest declaration of this court upon the subject is found in *Keokuk & Western Railroad* v. *Missouri*, 152 U. S. 301.   In that case, a railroad corporation chartered in Missouri in 1857, with a provision that its property should be exempt from taxation for a period of twenty years after its completion, which took place in 1872, was consolidated with an Iowa corporation in 1870, under a general law of Missouri; and in 1886 the consolidated road was sold under a deed of foreclosure to purchasers, who conveyed it to an Iowa corporation.   It was held that the act of the legislature of Missouri authorizing the consolidation, making one company of the two, whose stock should be consolidated upon such terms as might be mutually agreed upon, authorizing the adoption of a new corporate name and the exchange of the stock of the constituent companies for stock in the new company, and providing for the filing with the secretary of state of a copy of the consolidation agreement, which

should be conclusive evidence of the consolidation and of the corporate name of the new company, was in effect the extinguishment of the prior companies and the formation of a new one; and that an intervening constitutional provision, adopted in 1865, prohibiting exemptions from taxation, was thereby let in and to be read as a part of the charter of the new company.

In view of the terms of the consolidating agreement, to which reference has already been made, and of the several acts of the Legislature of Mississippi authorizing these consolidations, we are of opinion that a new corporation was contemplated, and that, taken together, these several documents should be read as if they had expressly provided, with legislative sanction, for the formation of a new association. Exemptions from taxation are not favored by law, and will not be sustained unless such clearly appears to have been the intent of the legislature. Public policy in all the States has almost necessarily exempted from the scope of the taxing power large amounts of property used for religious, educational and municipal purposes; but this list ought not to be extended except for very substantial reasons; and while, as we have held in many cases, legislatures may in the interest of the public contract for the exemption of other property, such contract should receive a strict interpretation, and every reasonable doubt be resolved in favor of the taxing power. Indeed, it is not too much to say that courts are astute to seize upon evidence tending to show either that such exemptions were not originally intended, or that they have become inoperative by changes in the original constitution of the companies. In cases arising under the Mississippi constitution of 1869, the method adopted in the charter of the Mobile and Northwestern Company of commuting the taxes was originally sustained under the theory that the provision of that constitution declaring "the property of all corporations for pecuniary profits shall be *subject* to taxation, the same as that of individuals," did not mean that it should be necessarily *subjected* to taxation, but that it might be exempted altogether by the legislature. *Mississippi Mills* v. *Cook,* 56 Mississippi, 40. But by the constitution of 1890, "all existing charters or *grants of corporate franchises* under which organi-

zations have not in good faith taken place at the adoption of this constitution, shall be subject to the provisions of the article," one of which was (section 181) that "the property of all private corporations for pecuniary gain shall be taxed in the same way and to the same extent as property of individuals."

It is true that in the act of March 9, 1882, authorizing the Baton Rouge Company to consolidate, in the act of March 3, 1882, authorizing the Memphis and Vicksburg Company to consolidate, and in the act of February 17, 1882, authorizing consolidations by the Yazoo Company, there were provisions that the consolidated companies should be entitled to the rights, privileges, franchises, property, grants and immunities belonging to constituent companies, among which, under the name of immunities, might pass an exemption from taxation, as has been sometimes held by this court; and had not the constitutional provision of 1890 taken effect before the final consolidation of 1892, we might have been obliged to hold that the consolidated company was entitled to the commutation of taxes provided for in the twenty-first section of the charter of the Mobile and Northwestern Company. But it is scarcely necessary to say that, if the consolidation of 1892 resulted in a new corporation, it would come into existence under the constitution of 1890, with the disabilities attaching thereto, among which is the provision that "the property of all private corporations for pecuniary gain shall be taxed in the same way and to the same extent as the property of individuals." Even if the legislature, in these several acts of consolidation, had expressly provided that the new corporation thereby formed should be exempted from taxation, the higher law of the constitution would be interpreted as nullifying it to that extent.

A similar remark may be made with regard to the provision that these companies might consolidate upon such terms as they should agree upon. Obviously such terms must be consistent with the law existing at the time of the consolidation. It could never have been the intention of the legislature, and if it were it would be vain, to permit these companies to adopt such terms as they chose, if such terms were inconsistent with existing laws. The language indicated evidently refers to the

method adopted for the consolidation, whether it was to be anything more than a simple merger, or whether it was to provide for a surrender of the stock of the constituent companies, the issue of new stock, the adoption of a new name and the choice of a new board of directors. Under no circumstances would they be interpreted as conveying rights to the new corporation which the legislature was incompetent to confer.

Great stress is laid by the railroad companies upon the fact that at the time these companies were incorporated the State was without credit, the treasury without money, the issue of state bonds in aid of public improvements forbidden by the constitution, the levy of general taxes to assist in the building of the roads fruitless, the resources of the State having been exhausted by the civil war, which had left the community so poor that it was with difficulty the inhabitants could raise the taxes necessary for carrying on the government; that millions of acres of land were being abandoned and forfeited to the State for non-payment of taxes and subsequently sold at incredibly low figures; that the paramount necessity was clearly the building of railroads to develop the resources of the State, and yet that the topography of the country was such that both the construction and the maintenance of the roads was difficult and expensive, and railroad enterprises promised very doubtful profits; that the lands along the river bottoms were waste and swamp, uncultivated and unexplored, and subject to annual inundations from the Mississippi; that the levees had been swept away again and again, and Congress asked for aid to rebuild them upon the ground of the impossibility of the State to do the work; that in this condition of affairs the best that could be done was to offer as a remuneration to vote taxes as a consideration for building the road; that these proposals were accepted and carried out in good faith; that the result has been to increase the value of property in portions of the State fully one hundred fold, and to immensely increase the revenues of the State and counties, and that under these circumstances the present repudiation of these contracts by the State, by pleading a technical incapacity to contract, is a gross breach of public faith, and should be discountenanced by the courts.

Potent as these considerations are, they address themselves to the legislative rather than to the judicial department of the government. The legislature is the proper guardian of the public faith, and in its action with respect to its own obligations, we are bound to assume that it will be guided, not only by its present necessity for revenue, but by consideration of its possible future needs. But whatever policy the State may choose to adopt with respect to encouraging or discouraging the investment of capital from abroad, the duty of the courts is to declare the law as they find it, and avoid the discussion of questions of policy, which are clearly beyond their province. Certainly this court is not the keeper of the State's conscience. We have not thought it proper to inquire what were the answers to these charges. Doubtless they are sufficient, or at least are such as the legislature deemed to be sufficient, or it would not have passed the taxing acts of 1892 and 1894. While we have never hesitated to vindicate the right of individuals or corporations to enforce the performance of lawful contracts as against subsequent legislation designed to impair them, we have always exacted as a condition that the contract was one which the legislature, or opposite party, had power to make under the Constitution, and that the other party was chargeable with knowledge of all its provisions in that connection. To enforce a performance, the plaintiff must also bring himself within the letter and spirit of the contract, and thus provide against any change in public sentiment which may render its performance obnoxious or unpopular.

Being of opinion that the consolidation in question, which took place nearly two years subsequent to the adoption of this constitution, was a new grant of corporate franchises within the meaning of section 180, it follows that it became subject to the provisions of section 181.

The question how far the case of *Railroad Co.* v. *Lambert*, 70 Mississippi, 779, is applicable as *res adjudicata* upon the taxes involved in this case, is a local question, upon which we are not called upon to express an opinion. We do not understand it to be pressed as ground for reversal.

The judgment of the Supreme Court is therefore

*Affirmed.*