**IRVING TRUST CO. v. UNITED STATES.**
No. 43100.

Court of Claims.
Jan. 8, 1940.

Wilton H. Wallace and Edward F. Colladay, both of Washington, D. C. (Colladay,

McGarraghy, Colladay & Wallace, of Washington, D. C., and Martin Saxe, of New York City, on the brief), for plaintiff.

D. F. Hickey, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, Sp. Assts. to Atty. Gen., on the brief), for defendant.

Before WHALEY, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHITAKER, Judges.

WHITAKER, Judge.

On November 9, 1926, the Irving Bank and Trust Company and the American Exchange-Pacific Bank, both New York corporations, entered into an "Agreement for Merger" of the two corporations, under the terms of which the Bank was to be merged into the Trust Company. This agreement provided that, after it had been approved by the Superintendent of Banks and by the stockholders of the respective parties, it should become effective upon the filing in the offices of the Superintendent of Banks and of the Clerk of New York County of sworn copies of the proceedings at the respective corporation meetings. These copies were filed on December 11, 1926, and the merger became effective on that date. Thereafter the business was operated under the name of American Exchange Irving Trust Company. The Irving Trust Company, the plaintiff herein, is the successor of the American Exchange Irving Trust Company.

Among the assets acquired by the American Exchange Irving Trust Company (hereinafter referred to as the Trust Company) was a piece of real estate known as "128 Broadway" and certain securities.

The question presented is the proper bases to be used for the real estate and securities in computing the gain derived from a sale of them in 1928.

The plaintiff insists that it is entitled to use as these bases the cost to it of these assets at the time of the merger. The defendant, on the other hand, insists that the bases to be used are the same as if the assets had remained in the hands of the transferor, the American Exchange-Pacific Bank.

The plaintiff insists that the transaction between the Bank and the Trust Company was a merger; the defendant says it was a consolidation. The plaintiff says this is material because the stockholders of the Bank, which it says was the only transferor, received no more than 37.8 per cent of the stock of the Trust Company. It, therefore, argues that section 113(a) (7) of the Revenue Act of 1928, 26 U.S.C.A. § 113(a) (7) note, does not apply, because immediately after the transfer there was not an interest or control in the property of 80 percent in the hands of the same persons as it was before the transfer. In other words, the plaintiff says that where a transaction amounts to a merger, as distinguished from a consolidation, there is but one transferor; and that the statute does not apply unless this transferor receives as much as 80 percent of the stock of the corporation into which it is merged. It concedes that the situation would probably be different in the case of a consolidation, because in the case of a consolidation there is more than one transferor, and so in determining whether or not an 80 percent interest or control is in the hands of the same persons, it is necessary to look to the interest or control of all the transferors.

The term "consolidation" is frequently used to denote both a fusion of two or more corporations into a newly created corporation, as well as an absorption of one or more corporations by a preexisting one. Thus Noyes in his book on "Intercorporate Relations" defines a consolidation as follows: "Two corporations may be combined by their fusion into a third corporation created in their stead. This results in the surrender of the vitality of the old corporations, the extinguishment of their special privileges and exemptions, and the springing into existence eo instanti of a new corporation, with such powers and privileges as may be conferred upon it by the act authorizing the 'consolidation.' The dissolution of all the old corporations and the creation of the new one are the essential features of this process * * *." and also as: "There may be an absorption of one company by another whereby the former is dissolved and passes out of existence while the latter continues to exist with enlarged powers. The word 'consolidation' has been said to be inapplicable to a union of this character, but such use of the term is general, and is supported by the highest authorities." (Article 8.)

Later, in Article 11 he defines a merger as follows: "The word 'merger' is used in

statutes authorizing the union of corporations to describe the process whereby the property and franchises of one or more corporations are absorbed by another which continues in existence with its original powers and with additional rights and privileges derived from the others. This is a process of absorption to which, as has been noted, the term 'consolidation' is generally applied, but to which the term 'merger' is equally appropriate. *In fact, had the word 'consolidation' been used only to describe the process of fusion and the word 'merger' been applied to the process of absorption, confusion would have been avoided."* [Italics ours.]

This distinction has been recognized by the Supreme Court in Yazoo and Mississippi Valley Railway Company v. Adams, 180 U.S. 1, 19, 21 S.Ct. 240, 246, 45 L.Ed. 395, "While, as stated in Tomlinson v. Branch, 15 Wall. 460, 21 L.Ed. 189, the presumption is that when two railroads are consolidated each of the united lines will be respectively held with the privileges and burdens originally attaching thereto, subsequent cases have settled the law that where two companies agree together to consolidate their stock, issue new certificates, take a new name, elect a new board of directors, and the constituent companies are to cease their functions, a new corporation is thereby formed subject to existing laws. But if, as was the case in Tomlinson v. Branch, one road loses its identity and is merged in another, the latter preserving its identity and issuing new stock in favor of the stockholders of the former, it is not the creation of a new corporation, but an enlargement of the old one."

The proceedings followed by the Bank and the Trust Company in this case were the proceedings set out by the New York banking law in sections 487–496 of the banking law of the State of New York, providing for the merger of banking corporations. In construing these statutes the Court of Appeals of New York in Cantor v. Manufacturers' Trust Company, 261 N.Y. 6, 184 N.E. 474, 475, 87 A.L.R. 594, said: "The statute does not contemplate the formation of a new banking corporation through the consolidation of two existing corporations. The result of the merger is that all the rights, privileges, and franchises, and all the property of a corporation which is merged into another, are 'transferred to and vested in the corporation into which it shall have been merged.' Its corporate identity is lost; it ceases to be a corporate entity, while the corporation into which it is merged continues in existence and succeeds to all its 'relations, obligations, trusts and liabilities.' "

Whether in this case we shall describe what was done between the Bank and Trust Company as a merger or a consolidation is perhaps not so important, but it is important to bear in mind what was said in Cantor v. Manufacturers' Trust Company, supra, and in Yazoo & Mississippi Valley Ry. Co. v. Adams supra, that a new corporation was not created, but the old one, to-wit, the Trust Company, was merely enlarged. The Bank went out of existence; the Trust Company continued in existence.

This is important, because in providing for the basis to be used in determining gain or loss in the case of a reorganization, which is defined to mean both a merger and a consolidation, section 112 (i) (1), the Revenue Act of 1928, 26 U.S.C.A. § 112 note says: "If the property was acquired after December 31, 1917, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control *in such property* of 80 per centum or more *remained in the same persons or any of them,* then the basis shall be the same as it would be in the hands of the *transferor* * * *."  (Sec. 113(a) (7).) [Italics ours.]

If what was done in this case was a merger and not a consolidation, then there was but one transferor, to-wit, the Bank. The Trust Company transferred nothing; it merely continued to exist, retaining in its hands the property which it had before the merger. The only property transferred was the property of the bank.

So, applying sub-section (7) of section 113(a) to this case, the "property acquired" was the property of the Bank; and the "interest or control in such property" of course refers to the "interest or control" in the property acquired or transferred; and when the act speaks of interest or control of such property remaining "in the same persons" it refers to the persons who formerly had an interest or control in it, to-wit, the Bank. It seems to us that in the case of a merger, before subsection (7) of section 113(a) becomes applicable, that company which is merged into the

other must acquire 80 per cent or more of the stock of the continuing corporation.[1]

A different situation arises where there is a consolidation of corporations. As was said in Yazoo & Mississippi Valley Ry. Co. v. Adams, supra: "* * * where two companies agree together to consolidate their stock, issue new certificates, take a new name, elect a new board of directors, and the constituent companies are to cease their functions, *a new corporation is thereby formed subject to existing laws.*" [Italics ours.]

If a new corporation is formed, it, of necessity, follows that the old corporations must transfer to the new one their property, or some of it, and in applying subsection (7) of 113(a) to such a transaction we would probably take into consideration the aggregate property acquired from all the corporations, and all the persons who had had an interest or control in any of it to determine whether or not an interest or control of 80 per centum or more remained in the same persons. At any rate, this is the application made of the statute to a consolidation, as distinguished from a merger, by the Seventh and Third Circuit Courts of Appeal in Fairbanks Court Wholesale Grocery Co. v. Commissioner, 84 F.2d 18, and in MacLaughlin v. Harr, 99 F.2d 638, 641.

We have no doubt under the facts in this case that the Trust Company continued its existence and that no new corporation was formed. It is true that the name of the Trust Company was changed from the Irving Bank and Trust Company to the American Exchange Irving Trust Company, but this amounted to no more than the change of the name of an individual. Notwithstanding the change of name, the same individual continues to exist, and in this case the same corporation continued to exist. No new charter was issued, and there was no transfer of the assets of the Irving Bank and Trust Company to the American Exchange Irving Trust Company.

The statutes of New York providing for a merger expressly provide for a change in the name of the continuing corporation, but they equally as definitely provide for the continuation of the old corporation, notwithstanding the change of name. Section 487 provides: "Any two or more corporations * * * are hereby authorized to merge one or more of such corporations into another of them as prescribed in succeeding sections of this article;" and section 488, in the second paragraph, provides: "Such agreement shall specify each corporation to be merged and the corporation which is to receive into itself the merging corporation or corporations * * *. Such agreement may provide the name to be borne by the receiving corporation and such name may be the name of any corporation which is a party to such agreement."

If, therefore, we look only to the letter of the statute in determining the applicability of subsection (7) of section 113(a) to this transaction, we must look alone to the Bank and its property to determine whether or not an 80 per centum control in the property transferred remained in the same persons in which it had formerly been vested.

This is the view of the Treasury Department at the present time. So far as material here, the Revenue Act of 1938, 52 Stat. 447, does not differ from the Revenue Act of 1928, and Article 113(a) (7)-1 of Regulations 101 issued pursuant to that Act in the fourth paragraph provides:

"Example (2): In 1925 the M Corporation exchanged 10 percent of its voting stock for all the property of the N Corporation which had a basis of $10,000 in the hands of the N Corporation. The basis of the property in the hands of the M Corporation is cost thereof to it at the time of the transfer, that is, the fair market value of the M stock exchanged for the property."

Moreover, this construction seems to us in harmony with the purpose of Congress. That purpose was to make the basis the

---

[1] That this may result is recognized in Cantor v. Manufacturers Trust Co., supra. There the court said:

"The Legislature quite probably assumed that ordinarily the merger agreement would provide that the largest and strongest corporation would by the merger absorb a weaker corporation or corporations; and that its stockholders would still dominate after the merger; but the Legislature has provided no standard by which determination of which corporation should receive the other or others into itself shall be made. That is left to the free choice of the corporations which are parties to the agreement."

same as it was before the transfer where there was no actual change of ownership, but a change only in the form of ownership. Here there was an actual change in ownership. The Trust Company, which before the transfer owned no interest in the property, owned more than 60 percent interest in it after the transfer.

So, in the case of a merger, at any rate, we think the corporation which is merged into another, or its stockholders, must acquire an 80 percent, or greater, interest in the continuing corporation before section 113(a) (7) is applicable.

■ The findings of fact show that the stock ownership of the former stockholders of the American Exchange-Pacific Bank in the Trust Company did not exceed 37.8 percent of the total stock outstanding after the merger. We, therefore, conclude section 113(a) (7) is inapplicable to the case at bar.

■ Where a corporation acquires property by the issuance of its own stock therefor, and the persons to whom its stock is issued are not in control of the corporation after receiving the stock, the cost to the corporation acquiring the property is, of course, the value of its stock issued therefor.

The value of the stock of the American Exchange Irving Trust Company on December 11, 1926, was $310 per share. The total number of shares issued was 100,000, making a total amount paid in stock of $31,000,000. In addition, each stockholder of the bank was paid $40 for each share of stock bought, or a total of $3,000,000, and the Trust Company assumed liabilities of the bank amounting to $169,290,944.25, making a total amount paid for all the assets of the bank $203,290,944.25.

In order to compute the amount paid for the real estate and securities sold in 1928 the plaintiff has introduced proof of the fair market value thereof and of the total market value of all assets acquired from which it computes that the market value of the real estate is 1.8 per cent of the total market value of all the assets acquired. It then says that 1.8 percent of the total amount paid for all the assets should be considered as the amount paid for the real estate, or $3,659,237. This cost price it deducts from the amount received for the property in 1928, to wit, $3,750,000.

We do not think this is the proper basis of computation. When the Irving Bank and Trust Company and the American Exchange-Pacific Bank were contemplating the merger and the amount which the Trust Company was willing to pay to the stockholders of the Bank for the Bank's assets, the Trust Company necessarily examined all the assets of the Bank, and agreed with the Bank on the amount to be paid for them. There is no positive proof in the record to show the value placed on each asset, but after the stockholders of the Bank and the Trust Company had approved the merger, the officers of the Trust Company sent their employees over to the Bank with instructions to install in the Bank the Trust Company's accounting system, and to write up the Bank's books in accordance with instructions received. Pursuant to these instructions, the value of 128 Broadway was "written up" from $1,800,000, at which figure it had been carried on the books of the Bank, to $2,600,000, and the value of the securities was written up about $400,000. Other assets apparently were allowed to remain at the value carried on the books of the Bank. When the assets of the Bank were incorporated in the Trust Company's books they were carried at these values. It seems to us that the necessary inference to be drawn from this is that the parties agreed, in arriving at the figure to be paid the stockholders of the Bank, that the foregoing were the values of the real estate and the securities in question. Evidently their attention had been directed to the value of their real estate and securities because their values were written up.

■ It seems to us, therefore, that we must take the figure $2,600,000 as the price which the Trust Company paid for the real estate, and the figure of $24,644,069.08 as the price paid for all the securities, and $2,647,095 as the price paid for the securities sold in 1928. We think the parties are bound by these figures, notwithstanding expert testimony as to their value introduced several years later, and after they had been sold in 1928.

It is true that the price paid for the assets exceeded the valuation placed on them by about $10,000,000. This excess presumably was paid for the good will of the Bank. It could not have been paid for the tangible assets, since we are convinced that the figure at which these assets

were carried on the books of the Irving Trust Company was the parties' valuation of the assets used in arriving at the total consideration to be paid.

The plaintiff having computed its profit on the basis of these figures in the return filed, it results that there was no overpayment of tax and that the plaintiff is not entitled to recover. Its petition will accordingly be dismissed. It is so ordered.