READING HARDWARE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5059. Promulgated June 15, 1927.

1. There is no basis under section 207 of the Revenue Act of 1917 and section 326 of the Revenue Act of 1918 for a revaluation of petitioner's assets for invested capital purposes at the time of the financial reorganization in 1911, as a result of which other corporations were merged with it, though assets of other companies which were paid in at this time may be included in its invested capital at their cash value at the time paid in.

2. A reduction in surplus, when surplus has been improperly increased in the first instance on account of assets which have not been paid in as contemplated by the statute, restores the surplus, or deficit, to its original condition and does not give rise to an operating deficit which did not theretofore exist.

*H. F. Kantner, Esq.*, for the petitioner.
*R. P. Smith, Esq.*, for the respondent.

The Commissioner has asserted deficiencies in income and profits tax for the years 1916, 1918, and 1920, in the respective amounts of $121.33, $676.33, and $19,900.11, and has determined overassessments for the years 1917 and 1919 in the respective amounts of $1,145.09 and $1,310.54. The petitioner questions the correctness of the Commissioner's determination in respect of the years 1917, 1918, 1919, and 1920, but concedes the correctness of his determination in respect of the year 1916. The Commissioner entered a plea in bar to the jurisdiction of the Board to make a determination as to the taxable year 1917, for the reason that the proposed adjustments in the tax liability for that year involve a refund of and not a deficiency in tax.

### FINDINGS OF FACT.

Petitioner, a Pennsylvania corporation with principal office at Reading, was originally incorporated in 1886, with an authorized capital of $900,000 consisting of 6,500 shares of common and 2,500 shares of preferred stock having a par value of $100 a share. All of the common stock and 1,000 shares of the preferred stock had been issued and were outstanding at the time of a financial reorganization in 1911.

In 1903 certain individuals who had secured a controlling interest in the petitioner through the acquisition of more than 50 per cent of its outstanding common stock organized the Consolidated Hardware Co., hereinafter referred to as the Consolidated Company, under the laws of the State of Delaware. These individuals transferred to the newly organized company their entire stock holdings in the petitioner, comprising 4,101 shares of common stock, in consideration of the issuance to them by that company of $757,100 par value of its " Collateral Trust 5% Gold Bonds," hereinafter sometimes referred to as the " Reading Bonds." The Consolidated Company executed a purchase-money collateral indenture, covering the stock of petitioner thus acquired, to the Colonial Trust Co. of Reading, Pa., as trustee, to secure an initial issue of such bonds in the aggregate principal sum of $757,100, with the right, upon the pledge of additional shares of the common stock of petitioner, to issue additional bonds in payment therefor at the rate of $184.6154 per share; and with the right, upon the pledge of the preferred stock and floating obligations of the petitioner, to issue additional bonds of a par value of $200,000 in payment therefor. Interest on these bonds was payable semi-annually, on the first days of January and July, and they were callable on July 1, 1913, or any interest date thereafter,

at par and accrued interest with a premium of 5 per cent, the entire issue maturing on July 1, 1943.

Subsequently, but prior to the year 1911, the Consolidated Company acquired the balance of petitioner's outstanding common stock by the issuance of additional bonds under the indenture hereinbefore referred to, making a total of $1,200,000 par value of bonds, "Reading Hardware Company Series," given in exchange for $650,000 par value of common stock of the petitioner.

At the time of the first exchange of bonds for stock, as referred to above, a controlling interest in the petitioner, consisting of more than 50 per cent of petitioner's common stock, was vested in Albert A. Gerry and John E. Harbster, and after all of the said bonds had been issued and until 1911, ownership of the $650,000 par value of the common stock of the petitioner was vested in the Consolidated Company.

In 1904, the Consolidated Company purchased 3,560 shares of the preferred stock of the National Brass and Iron Works, hereinafter sometimes referred to as the Brass Company, at a price of $50 per share, which were paid for by the issuance of $178,000 par value of its "Collateral Trust 5% Gold Bonds, National Brass and Iron Works Series," hereinafter sometimes referred to as the "Brass bonds." It executed a purchase-money collateral indenture, covering the stock of the Brass Company thus acquired, to the Colonial Trust Co. of Reading, Pa., as trustee, to secure an initial issue of such bonds in the aggregate principal sum of $178,000, with the right, upon the pledge of additional shares of the preferred stock of the Brass Company, to issue additional bonds in payment therefor, at the rate of $50 per share. Interest on these bonds was payable semi-annually, on the first days of April and October, and they were callable on April 1, 1914, or any interest date thereafter, at par and accrued interest with a premium of 5 per cent, the entire issue maturing April 1, 1934.

Subsequently, but prior to the financial reorganization in 1911, the Consolidated Company acquired additional preferred stock of the Brass Company through the issuance of additional bonds under the terms of the last-named indenture to the extent that the Consolidated Company acquired substantially all the preferred stock of the Brass Company, for which Brass bonds had been given in exchange of the same par value, which condition of ownership existed in 1911.

The indentures covering both issues contained appropriate provisions as to remedies of trustees and bondholders in the event of default in the payment of interest or principal.

Prior to 1910, the Keystone Hardware Co., hereinafter referred to as the Keystone Company, was incorporated, and its plant was,

at the time of petitioner's financial reorganization in 1911, under lease to the petitioner for a term of 999 years.

Some of the stockholders in the petitioner were likewise interested, through the ownership of stock, securities or otherwise, in the Consolidated Company, the Brass Company, and the Keystone Company to the extent that in 1911, and for several years prior thereto, there was a substantial community of interest as far as the four companies were concerned.

In March, 1910, a reorganization committee was appointed by petitioner's board of directors, and on July 1, 1910, an agreement, embodying certain plans for the reorganization of the petitioner, the Consolidated Company, the Brass Company and the Keystone Company, was entered into by this committee together with the holders of the securities of the other companies aforementioned. On May 1, 1911, a new agreement, known as " Modification of Plan and Amendment of Agreement of Reorganization dated July 1, 1910," was entered into by the reorganization committee as parties of the first part; such of the holders (therein referred to as the " Reading Bondholders ") of the " Consolidated Hardware Company Forty Year Five Per Cent. Gold Bonds " (therein referred to as the " Reading Bonds ") secured by the common stock of the Reading Hardware Co. (therein referred to as the " Reading Company ") ; such of the holders (therein referred to as the " Brass Bondholders ") of " Consolidated Hardware Company Thirty Year Collateral Trust Five Per Cent. Gold Bonds, National Brass and Iron Works Series " (therein referred to as the " Brass Bonds ") secured by preferred stock of the National Brass and Iron Works (therein referred to as the " Brass Company ") ; such of the holders (therein referred to, respectively, as " Consolidated common stockholders " and " Consolidated preferred stockholders ") of the common and preferred stock of the Consolidated Hardware Company (therein referred to as the " Consolidated Company ") ; such of the holders (therein referred to as the " Reading preferred stockholders ") of the preferred stock of the Reading Company; such of the holders (therein referred to, respectively, as " Brass preferred stockholders " and " Brass common stockholders ") of the preferred and common stock of the Brass Company; and such of the holders (therein referred to as the " Keystone stockholders ") of the capital stock of the Keystone Company—as may become parties to the agreement in the manner therein provided, and referred to jointly as the " Depositors," parties of the second part; the Pennsylvania Trust Company of Reading, Pennsylvania (therein referred to as the " Depositary "), as party of the third part; and the petitioner herein, as party of the fourth part. Said agreement on May 1, 1911, merely embodied the amendments and modifications of the original agree-

ment of July 1, 1910, and provided that "All provisions of the original agreement not modified or amended hereby, are hereby confirmed." It further provided as follows:

3.—Section E of Paragraph Fifth of the original plan and agreement relative to the proposed increase of common stock and the exchange thereof, shall be and is hereby amended to read as follows:

The present $650,000 of common stock of the Reading Company shall be increased by a dividend of $950,000 to $1,600,000.

Of this latter amount, $1,200,000, or so much thereof as may be necessary, shall be given to the depositing Reading Bondholders, so that each depositing bondholder of Reading Bonds shall be entitled to receive one share of common stock of the Reading Company of the par value of $100, for each and every $100 of bonds deposited by said depositor.

Of the remaining common stock, $350,000, or so much thereof as may be necessary, shall be given to the depositing Brass Bondholders, and the depositing Brass Preferred Stockholders, so that each depositing bondholder of Brass Bonds and each depositing Brass Preferred Stockholder shall be entitled to receive one share of common stock of the Reading Company of the par value of $100 for each and every $100 of bonds or preferred stock deposited by said depositor.

Of the remaining common stock, $50,000, or so much thereof as may be necessary, shall be given to the depositing Keystone stockholders, so that each depositing stockholder of Keystone stock shall be entitled to receive one share of common stock of the Reading Company of the par value of $100, for each and every $600 of Keystone stock deposited by said depositor;

Any Reading common stock left undistributed, shall remain in the hands of the Committee for sale or pledge by it, or for use by it otherwise under the terms of the original reorganization agreement. If any such undistributed Reading common stock shall finally remain undisposed of, the Committee shall assign said undistributed Reading common stock before their final discharge to the Reading Company to be held by it as Treasury stock and to be disposed of as the Board of Directors of the Reading Company shall decide.

At a meeting of petitioner's board of directors on July 20, 1911, the following resolution was adopted:

WHEREAS the Capital Stock of the Company outstanding and authorized is as follows:

Preferred stock_____ $100,000.
Common stock_____ 650,000.

Preferred Stock authorized by Stockholders March 10, 1903 $150,000.00, making a total of $900,000; and .

WHEREAS, the reorganization agreement as amended contemplates the increasing of the capital stock from the said sum of $900,000 to $1,700,000. all of the said stock excepting the $100,000 of preferred stock already outstanding and $100,000 of additional of preferred stock, that is to say, $1,500,000 of capital stock issued, be issued as common stock; and

WHEREAS, it is the purpose to issue the additional $100,000 of preferred stock in exchange for the new outstanding preferred stock, thus leaving about $1,600,-000 of common stock available for issuance; and

WHEREAS, the additional common stock is to be issued as a stock dividend on the basis of the surplus and reserve of the company, and it is necessary

that the surplus and reserve be ascertained and stated so that it shall be plain that no stock shall be issued pursuant to the said plan in excess of the surplus and reserve.

THEREFORE RESOLVED:

(1) That the sum of $26,250 stated in the balance sheet of June 30th, 1911, as owing for rental to the Keystone Hardware Company, be reduced on account of the shares of Keystone Hardware Company, which have been deposited under the reorganization agreement as amended, being virtually owned by the Reading Hardware Co., and only such part of the said rental as might be supposed payable to the stockholders of the Keystone Hardware Co. who have not deposited their stock under the said agreement, is or will be a liability of the Reading Hardware Company, the said sum being $5,586.88, so that the said liability instead of being, $26,250. is only $5,586.88.

(2) That a proportion of the value of the Keystone Hardware Company's plant which also virtually becomes the property of the Reading Hardware Co., be to the extent of the proportion of stock of the Keystone Hardware Co., deposited under the reorganization agreement as amended, added to the assets of the Reading Hardware Co., the said proportion being $39,358.33.

(3) That 33/35 of the value of the National Brass Works property, that being the proportion of the Consolidated Hardware Co., bonds, National Brass series, which have been deposited under the reorganization agreement as amended, be also added to the assets of the Reading Hardware Company, the said property being valued at $75,000 less an encumbrance of $12,000 and 33/35 thereof being $59,400.

The above will make the surplus and reserve of the Reading Hardware Company, considerably in excess of the additional stock proposed to be issued.

The foregoing action was approved by petitioner's stockholders on the same day.

Petitioner's board of directors adopted the following resolution on September 26, 1911, which action was approved by petitioner's stockholders on the same day:

WHEREAS, after the adoption of RESOLUTION of July 20, 1911, the Manufacturers' Appraisal Company was procured to extend its appraisement of August 31, 1910, to August 31, 1911, including the National Brass & Keystone plants; and

WHEREAS, taking the said appraisement and taking also the current assets including the securities as they appear on the books, which are not embraced in the said appraisement, and making deductions of all liabilities, there is shown net assets amounting to $1,649,550.43; and

WHEREAS, in order to carry out the Reorganization Agreement as amended with respect to all persons depositing thereunder, there will have to be issued additional capital stock amounting to $935,100.00, but $40,500.00 thereof would be issuable to the Reading Hardware Company on account of securities held by it, and the same purpose can be accomplished by simply leaving such stock unissued; and

WHEREAS, by leaving such stock unissued there will be issuable to parties other than the Reading Hardware Company, who have deposited their securities, $895,400.00, making altogether with the outstanding stock $1,645,400.00 a sum less than the amount of net assets.

Now THEREFORE BE IT RESOLVED, That in furtherance of the said agreement, there be declared a stock dividend of 138 per centum on the outstanding common stock of $650,000.00, the total dividend being $897,000; that the said

stock be issued as full-paid common stock and not subject to further calls or assessments.

RESOLVED, That the above RESOLUTIONS be submitted to the stockholders at a meeting called to be held this day.

On motion duly seconded the following resolution was ordered to be submitted to the stockholders at a special meeting to be held this day for their approval or disapproval.

WHEREAS, a stock dividend of 138 per centum has been declared upon outstanding common stock, therefore:

RESOLVED, That the $100,000 of Preferred stock authorized by the stockholders to be issued in exchange for existing preferred stock, be issued as follows:

(1) The stock to entitle the holder thereof to receive cumulative yearly dividends of six per centum payable semi-annually on the first days of April and October each year before any dividend shall be set apart or paid on the common stock; and also in the event of liquidation or dissolution, to be paid in full, both principal and accrued dividends, before any amount shall be paid to the holders of common stock.

The stock not to entitle the holder to vote and to be redeemable at 105 and accrued dividends, at any dividend paying period after ninety days' notice.

(2) The said stock shall be issued only in exchange for existing preferred stock and from time to time as any holder of existing preferred stock shall surrender his stock, a certificate or certificates for a like number of shares of such new preferred stock, shall be delivered to the surrendering stockholder in exchange, so that the aggregate amount of preferred stock outstanding shall at no time exceed $100,000.

The Common Stock of the Company issued and authorized to be issued is:

| | |
|---|---:|
| Outstanding_____ | $650,000 |
| Preferred stock unissued but authorized Mar. 10, 1903, and now to be issued as common stock_____ | 150,000 |
| Additional stock authorized by stockholders July 20, 1911_____ | 800,000 |
| Total_____ | $1,600,000 |

This total of $1,600,000 shall be issued in pursuance of the reorganization agreement as amended, that is to say, to the holders of Consolidated Hardware Company bonds—National Brass series—$350,000, or so much thereof as may be necessary to satisfy depositing bondholders.

To the Keystone Hardware Company $50,000, or so much thereof as may be necessary to satisfy depositing stockholders.

To the holders of the Consolidated Hardware Company bonds, Reading Hardware Company series—$1,200,000, or so much thereof as may be necessary to satisfy depositing bondholders.

The said stock shall be issued to the Reorganization Committee upon that Committee surrendering for cancellation the outstanding $650,000 of common stock.

On or shortly prior to August 31, 1910, the Manufacturers' Appraisal Co. made an appraisal of petitioner's plant and that of the Keystone Company on the basis of reproduction new less an estimated amount for accrued depreciation and the books of the petitioner were adjusted in conformity therewith, showing therein the properties of both plants.

When the financial reorganization in question was decided upon the same appraisal company extended the 1910 appraisals for the

petitioner's plant and the Keystone plant to August 31, 1911, and the books were again adjusted in conformity therewith, the following entries being made:

Reserve for Depreciation of Fixed Assets_____ $452, 185. 55
    To Profit and Loss_____ $452, 185. 55
            To close account.
Profit and Loss_____ $213, 353. 21
    To Buildings and Building Equipment—Main Plant_____     73, 365. 96
    To Buildings and Building Equipment—Keystone_____      1, 040. 51
    To Manufacturing Machinery and Minor Equipment—Main
        Plant_____     57, 715. 10
    To Manufacturing Machinery and Minor Equipment—Key-
        stone_____      4, 863. 18
    To Power Plant Operating Equipment—Main Plant_____     13, 433. 15
    To Dies, Tools, etc_____     44, 951. 43
    To Furniture and Fixtures—Factory_____      7, 241. 39
    To Furniture and Fixtures—Keystone_____        427. 98
    To Furniture and Fixtures—Lawn Mower Department_____        167. 08
    To Furniture and Fixtures—Main Office_____        589. 77
    To Stable Equipment_____      1, 310. 62
    To Electros and Wood Cuts_____      8, 247. 04
            To correct accounts to conform with Appraisal Company
            values as of August 31, 1911.
Power Plant and Equipment—Keystone_____ $965. 10
Patterns and Drawings_____ 1, 034. 29
    To Profit and Loss_____      1, 999. 39
            To correct accounts to conform with Appraisal Com-
            pany's values of August 31, 1911.

By means of the foregoing entries, surplus was increased by two amounts, $452,185.55 and $1,999.39, and decreased by one amount, $213,353.21, making a net increase of $240,831.73.

In addition to the foregoing entries, the following entry was made on the same date to set up securities which had not theretofore appeared on the books of the petitioner:

280 Shares Reading Preferred Stock_____ $28, 000. 00
$40,500 Consolidated Hardware Company Bonds (Reading Series)
    being $40,500 of capital stock or ($1,200,000) $21,937.50 of
    $650,000 common stock Book value $238.00 per share_____     52, 211. 25
4,723 Shares Keystone Hardware Company Stock, based on Manufac-
    turers' Appraisal Company's Values of August 31, 1911 of
    $55,514.18_____     43, 698. 91
$340,850 Bonds, Consolidated Hardware Company (National Brass
    and Iron Works Series) and Preferred Stock of National Brass
    and Iron Works, based on Manufacturers' Appraisal Company
    Values of August 31, 1911 of $85,976.23 less $12,000 mortgage____     72, 042. 28
1,500 Shares Reading Machine Screw Company, being ⅜ of Capital
    Stock based on valuation of its plant $28,000 less mortgage and
    debts of $15,000_____      4, 875. 00
20 Shares Philadelphia Bourse at $4.00 per share_____        80. 00
                                                                    _____
    To Profit and Loss_____$200, 907. 44

In order to carry into effect the resolution of the petitioner's board of directors " That the sum of $26,250 stated in the balance sheet of June 30, 1911, as owing for rental to the Keystone Hardware Company, be reduced on account of the shares of Keystone Hardware Company, which have been deposited under the reorganization agreement as amended, being virtually owned by the Reading Hardware Company, and only such part of the said rental as might be supposed payable to the stockholders of the Keystone Hardware Company who have not deposited their stock under the said agreement, is or will be a liability of the Reading Hardware Company, the said sum being $5,586.88, so that the said liability instead of being $26,250 is only $5,586.88," and to make further adjustment in the same account due to the rental period from June 30, 1911, to August 31, 1911, not already considered, the following journal entry was made:

Keystone Hardware Company Rental_____ $22, 631. 04
    To Profit and Loss_____ $22, 631. 04
        Rental on 4,723 shares of stock held by the reorganization
        committee.  From October 1, 1909 to August 31, 1911—1–11/12
        years at $2.50 per share.

After giving effect to the foregoing entries, the surplus as shown by the books of the petitioner on August 31, 1911, was $899,550.43, exclusive of the outstanding capital stock, or a total of net assets shown by petitioner's books, after adjustment for the appraisal and current assets not included in the appraisal, of $1,649,550.43 ($899,-550.43 surplus plus $750,000 outstanding capital stock).

Prior to the making of the aforementioned appraisals, the officers of the Consolidated Company and the petitioner had removed machinery, equipment, supplies, etc., from the plant of the Brass Company and these assets are included in these appraisals, but are not segregated in any manner by which it is possible to identify either the assets or the value placed thereon.  The plant of the Brass Company, exclusive of machinery, equipment, supplies, etc., is not included in the appraisals, though it was in the control of the petitioner on July 7, 1911, when the following resolution was adopted by petitioner's board of directors:

Upon motion duly made and seconded the Finance Committee was authorized to investigate the matter of the disposition of the National Brass and Iron Works plant and report as to whether it can be sold or rented and at what terms together with their recommendation.

On September 26, 1911, a stock dividend was declared from the above-indicated surplus of $1,649,550.43, in accordance with the resolution of September 26, 1911, heretofore referred to.  The journal entries on account of this issuance of stock were as follows:

Profit and Loss_____ $897,000
   To Dividend_____ $897,000
      For dividend of 138% declared September 26th, pay-
        able in stock to stockholders of record this day.
Dividend _____ 897,000
   To Capital Stock_____ 897,000
      For stock dividend declared September 26th and issued
        October 28, 1911.

Prior to October 28, 1911, the 6,500 shares, common stock, of the petitioner were acquired by the Reorganization Committee at a foreclosure sale had by the Colonial Trust Co., trustee in the indenture under which this stock was pledged as collateral when the Consolidated Company issued bonds in 1903 denominated "Reading Hardware Company Series." When the stock, on account of the stock dividend declared by petitioner on September 26, 1911, was issued the entire amount went to the Reorganization Committee, making a total in their hands of 15,470 shares, which stock was distributed and was outstanding after the financial reorganization had been completed. During 1912 the 6,904 shares, preferred stock, of the Brass Company were sold at a foreclosure sale had by the Colonial Trust Co., trustee in the indenture under which this stock was pledged as collateral, when the Consolidated Hardware Co. issued bonds in 1904 denominated "National Brass and Iron Works Series," purchase being made by the Reorganization Committee, in the interest of the petitioner, for $531.02.

During 1911 and 1912 substantially all of the other stocks and bonds which were to be transferred to the Reorganization Committee in accordance with the reorganization agreement as amended, had been so transferred and before, on, or shortly after November 26, 1912, the petitioner, the Reorganization Committee, and the Pennsylvania Trust Co., depositary, took the necessary steps for the delivery of the stocks, bonds and papers held by the Reorganization Committee and the Pennsylvania Trust Co. to the petitioner. The Reorganization Committee was thereupon ordered discharged from further duties and responsibilities.

After the above transactions had taken place, the petitioner held 6,904 shares of preferred stock of the Brass Company out of a total of 7,000 shares and steps were taken to effect its dissolution, such dissolution being finally effected shortly prior to March 25, 1913. Prior to its dissolution, its plant was sold by the assignee for the benefit of its creditors at a public sale on December 27, 1911, and was purchased by the Reorganization Committee in the interest of the petitioner, the principal creditor, for $5,000, subject to a mortgage of $12,000. No payment was made of the purchase price, but, instead, the plant was conveyed to the petitioner on account of its

claim. In 1912, petitioner sold it for $50,000, the purchaser assuming the aforementioned mortgage of $12,000.

When the stocks and bonds of the Consolidated Company were received by the petitioner, they were ordered canceled by the petitioner's board of directors and the final papers relative to the receivership of the Consolidated Company were presented to petitioner's board of directors on March 25, 1913.

In the year or years covered by the financial reorganization, the petitioner did not secure a new charter, but continued to operate under the old charter with which it came into existence in 1886.

The Keystone Company continued in existence at least later than 1912.

On March 12, 1912, the board of directors of the petitioner authorized its treasurer to set up an account on its books " to cover the patents, good will and trade-marks, of the company not now represented in any of the assets, to an amount not exceeding $500,000," and in accordance with such authority its accountants entered upon its books an account of this character, which was debited with the sum of $500,000, and the surplus account was credited with a similar amount. On December 31, 1917, the sum of $400,000 was written off by debiting surplus and crediting patents, good will and trade-marks and the balance of $100,000 was subsequently written off in the same manner, thereby closing this account.

The petitioner, in determining its invested capital for profits-tax purposes for 1917 and subsequent years restored the foregoing account as an asset, thus increasing its invested capital. The Commissioner, however, for the same purpose, eliminated the $500,000 from the par value of the capital stock, thus reducing invested capital and changing the tax liability accordingly, though he now admits that since good will was originally set up as a credit to surplus, the elimination should have been from surplus and not from capital stock.

OPINION.

LITTLETON: The errors assigned by the petitioner are:

(1) Failure to make proper adjustment in its invested capital for 1917, 1918, and 1919 on account of a " loss on Keystone Hardware Co. stock " which was taken by the petitioner as a deduction from gross income in 1916, but not allowed by the Commissioner until 1918.

(2) Elimination of $500,000 for good will restored by a charge against capital stock instead of a charge against surplus in determining invested capital for 1917, 1918, 1919, and 1920.

The Commissioner filed a plea in bar to the right of the petitioner to maintain this proceeding as to the year 1917 on the ground that

"the adjustment in the tax liability for the said year, against which the taxpayer appeals, is a refund and not a deficiency."

The position of the Commissioner is well taken in so far as it applies to a consideration of the amount of refund which may be due for 1917. *Appeal of Cornelius Cotton Mills*, 4 B. T. A. 255. It should be noted, however, that the appeal comes before the Board on a notice of deficiencies for 1918 and 1920 and the major item on account of which the appeal is taken carries through for all years. Section 274(g), Revenue Act of 1926 provides:

The Board in redetermining a deficiency in respect of any taxable year shall consider such facts with relation to the taxes for other taxable years as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other taxable year has been overpaid or underpaid.

We said in the *Appeal of Cornelius Cotton Mills, supra:*

In determining the correct amount of the deficiency, we may consider such facts with relation to taxes for other taxable years as may be necessary correctly to redetermine the amount of the deficiency involved; for example, in determining the invested capital for the year for which the deficiency against a corporation has been determined, we may determine what was the tax liability during a preceding year.

The plea of the Commissioner is, therefore, overruled in so far as a consideration of 1917 may be necessary for a correct determination of the deficiencies for 1918 and 1920.

At the hearing the petitioner and respondent filed a Joint Exhibit marked "Exhibit A" in which they agreed as to the adjustment which should be made on account of the first error assigned above, and therefore this point will not be considered further.

Before considering the other point raised, we find it necessary to go beyond the pleadings and consider the real issue in the case, an issue not raised either in the petition or in the answer by the Commissioner, but one on account of which almost the entire evidence was presented and one which is fundamental in a determination of the petitioner's invested capital, viz., the amount of the surplus or deficit at the time good will was increased by $500,000, which, in turn, involves the effect on invested capital of a financial reorganization in 1911.

The facts relative to what took place in 1911 are quite complicated and the evidence with respect thereto is not very clear. We are handicapped in the first instance by the failure of the petitioner to submit the original plan of reorganization, and we have had to rely on the amendments to the original plan and secondary evidence presented to show what was agreed as the complete plan of bringing the four allied companies together. Further, the evidence is incomplete

in many particulars which would have been helpful in tracing the detailed steps in the consummation of the plan.

Petitioner's counsel states in his brief filed after the hearing, with respect to the additional point which we find it necessary to consider, as follows:

The invested capital of the taxpayer for the year 1917 and subsequent years must be based on the amount of capital stock of Reading Hardware Company issued by it under the reorganization plan effected in 1911, subject only to proper additions and deductions for later years.

In this we can not concur. The above position is evidently based upon the proposition that there was such a change of status of the allied corporations in 1911 that it would be considered that their assets were paid in to the petitioner at this time as contemplated by section 207, Revenue Act of 1917 and section 326, Revenue Act of 1918. In 1911 there was a revaluation of the assets of the petitioner, the Keystone Company and such assets of the Brass Company as had been taken from that plant and intermingled with the assets of the petitioner. On the basis of the surplus which was shown by setting up this valuation on the books of the petitioner and by setting up certain securities which came to the petitioner through the financial reorganization plan of July 1, 1910, as modified by the amended plan dated May 1, 1911, a stock dividend was declared on September 26, 1911, of $897,000, par value of common stock of the petitioner, which, together with the capital stock already outstanding and the surplus remaining after the declaration of the stock dividend, the petitioner contends should be the starting point for invested capital purposes.

Before considering the question of the correctness of the valuation on which petitioner's invested capital is based, we must determine whether there was a basis for such valuation in 1911, i. e., whether the assets of the allied companies on which the valuations were placed can be considered as having been " paid in " in 1911 as contemplated by the provisions of the statutes heretofore referred to.

In the first place, were the assets which were owned by the petitioner prior to 1911 again paid in to the petitioner in 1917? The question answers itself in the negative when we consider that the corporation with which we are here dealing is the same legal entity which came into being in 1886, and its legal existence was not changed in the slightest by what took place in 1911 and 1912. It has the same charter in the taxable years under consideration with which it began business in 1886. There were changes in stock ownership during the period of its existence, but this did not affect the ownership of its assets. That the ownership of stock and ownership of assets are not identical and that changes of ownership in stock may

occur without affecting the ownership of the assets has been so long recognized that it hardly admits of questioning. See *United States* v. *Phellis*, 257 U. S. 156; *Rockefeller* v. *United States*, 257 U. S. 176; and *Cullinan* v. *Walker*, 262 U. S. 134.

In *Appeal of Regal Shoe Co.*, 1 B. T. A. 896, the Board said:

We need not dwell upon the well recognized distinction between a corporation and its stockholders, nor repeat what so frequently has been said to the effect that the ownership by a corporation is not the ownership of its stockholders, and that the rights and liabilities of the former are separate from those of the latter.

What, therefore, happened in 1911 with respect to the petitioner did not affect the legal existence of the corporation, even though there were changes as to stockholdings, and the value of its assets for invested capital purposes, in so far as it relates to assets which it acquired prior to the financial reorganization, must be based upon the original cost at date of acquisition. These assets were not paid in to the petitioner at this time, but were paid in from 1886 until this time.

Nor does the fact of a stock dividend in 1911 aid the petitioner in its contention, since nothing thereby came in to the corporation in so far as its previously owned assets were concerned. In *Gibbons* v. *Mahon*, 136 U. S. 549, the court said:

A stock dividend really takes nothing from the property of the corporation, and adds nothing to the interests of the shareholders. Its property is not diminished, and their interests are not increased. After such a dividend, as before, the corporation has the title in all the corporate property; the aggregate interests therein of all the shareholders are represented by the whole number of shares; and the proportional interest of each shareholder remains the same. The only change is in the evidence which represents that interest, the new shares and the original shares together representing the same proportional interest that the original shares represented before the issue of the new ones.

In *LaBelle Iron Works* v. *United States*, 256 U. S. 377, this statement is made in regard to a stock dividend:

That distribution, in substance and effect, was an internal transaction, in which the company received nothing from the stockholders any more than they received anything from it.

We must hold, therefore, that to the extent that petitioner's invested capital is based on a revaluation of assets in 1911 which were acquired prior to this time, it can not be sustained.

Our next consideration is to determine whether there were other assets which can be said to have been paid in to the petitioner at the time of this financial reorganization.

We will first examine the Brass Company. In 1904, substantially all of its preferred stock was acquired by the Consolidated Company in exchange for an issue of bonds, which condition of ownership

existed in 1911. The Brass Company also had a relatively small issue of common stock, but this was of so little consequence that it was given but negligible consideration in the working out of the financial reorganization plans. By the deposit of securities under the reorganization plan this preferred stock of the Brass Company came to the Reorganization Committee and the petitioner issued a part of the stock dividend heretofore referred to of like par value as the preferred stock in exchange therefor. When this occurred, the petitioner acquired tangible assets, viz., preferred stock, which can be considered at its actual cash value as paid in at this time. Likewise, in 1913, when the petitioner, through ownership of substantially all of the stock of the Brass Company, effected a dissolution in liquidation of the Brass Company, it became the owner of the Brass Company assets, if any, and was entitled to a valuation for invested capital purposes at their cash value as paid in in 1913. *Appeal of Regal Shoe Co., supra.*

For a like reason as in the case of the Brass Company, the interest in the stock of the Keystone Company which came to the petitioner through the reorganization plans and which was not formerly owned by the petitioner may properly be included in the invested capital of the petitioner at its cash value at date of acquisition in 1911.

Through the financial reorganization the petitioner also received the stock and bonds of the Consolidated Company, but we do not see anything here of value as having been paid in, which is not otherwise accounted for. This company was organized as a holding company and issued its bonds for the entire common stock of the petitioner and substantially all the preferred stock of the Brass Company. With the surrender to, and cancellation by, the petitioner of these bonds, the petitioner was not thereby relieved of any liability nor did that constitute a payment of anything of value in to the petitioner. The stock of the petitioner, which was the only asset back of the Reading bonds of the Consolidated Company, did not become an asset of the petitioner, but merely passed to the persons entitled thereto under the reorganization agreement who thereby became stockholders of the petitioner. The stock of the Brass Company for which the Brass bonds of the Consolidated Company were issued, and which became an asset of the petitioner is accounted for in another connection. As to the capital stock of the Consolidated Company we are convinced that counsel for the petitioner made a correct statement of its status in these words, when presenting the case to the Board:

Of course, from the figures that I have given you, it is evident that the Consolidated Hardware Co. stock should not or could not be given any value because there was not sufficient there for that purpose, and that was all lost in the transaction, and surrendered.

As further indicating its lack of value we find that while the stockholders of the Consolidated Company are mentioned as parties to the reorganization agreement, no provision is made for the receipt by them of any payment for their stock upon the surrender thereof.

We next consider the valuation of the several classes of assets which may properly be considered as entering into petitioner's invested capital on the basis hereinbefore indicated.

We have already stated that as to petitioner's assets which were owned by it prior to 1911 there could be no revaluation in 1911, but that original cost to the petitioner should be used. From the evidence submitted we find that the petitioner has not attempted to use an original cost basis. In the first place an appraisal was made in 1910 of its assets on the basis of reproduction new less an estimated amount for accrued depreciation, and included in this appraisal were certain assets of the Brass Company to which it did not have title, and assets of the Keystone Company. On August 31, 1910, on the basis of this appraisal, new fixed-asset accounts were set up by the petitioner in accordance with the classification of assets and values fixed in the appraisal, the old accounts being charged off, and a depreciation reserve provided for on account of these fixed assets.

On August 31, 1911, the 1910 appraisal was extended to that date and the fixed-asset accounts on petitioner's books again adjusted in conformity therewith, the entire depreciation account being closed out as a credit to profit and loss, various fixed assets reduced or increased, the net effect being an increase in surplus of $240,831.73.

The above net increase in surplus of $240,831.73 is attributable not only to a revaluation of petitioner's assets, but also of assets of the Brass Company which it had removed to its plant prior to the vesting of a property right therein and to which it did not have title when the foregoing appraisals were made, and assets of the Keystone Company. Obviously any part of this increase which may be due to the Brass Company assets is properly to be eliminated, since title thereto had not yet vested in the petitioner. As to the Keystone Company assets we have found that this company's plant was being operated under a 999-year lease at and prior to 1911, that through the financial reorganization 4,723 shares of its stock came to the petitioner and that the company continued in existence as late as 1913. To permit of the inclusion of these assets in the invested capital of the petitioner on account of the 1911 appraisal, it must be held that these assets were paid in to the petitioner in 1911. This, however, is inconsistent with the facts as the most that was acquired at this time was 4,723 shares of Keystone Company stock, which we have heretofore said in this opinion is different from the acquisition of the assets. Any of the foregoing increase in the petitioner's surplus in 1911 on account of the Keystone assets was, therefore, erroneous.

We are constrained, therefore, to hold that in a redetermination of petitioner's income and profits tax for the years on appeal the increases in surplus in 1911 in the amount of $240,831.73 should be eliminated from invested capital.

At the same time that adjustments were made for the appraisals referred to above, there was a further increase in surplus of $200,-907.44 on account of securities which came to the petitioner through the deposit of securities under the reorganization agreement. The first item entering into this total is "280 Shares Reading Preferred Stock $28,000." The record is not sufficiently complete to show exactly the manner in which this stock of the petitioner was returned to the petitioner, but regardless of whether acquired by gift or purchase, it could not give rise to an increase in invested capital. If received by gift, it would not operate to increase invested capital until disposed of, when the amount realized therefrom in the form of assets would serve to increase invested capital. See *Appeal of Musical Instrument Sales Co.*, 1 B. T. A. 402. If acquired by purchase, the amount paid therefor by the petitioner would amount to a return of capital to the stockholders and, therefore, would operate to reduce capital originally paid in. Suffice it to say, therefore, that in either event, an increase in invested capital would not arise as indicated by the foregoing journal entry, and to the extent that proper elimination has not already been made, invested capital should be adjusted accordingly.

The second item entering into the aforesaid credit to surplus is entitled:

$40,500 Consolidated Hardware Company Bonds (Reading Series) being $40,500 of capital stock or ($1,200,000) $21,937.50 of $650,000 common stock book value $238.00 per share—$52,211.25.

The foregoing entry sets up as an asset $40,500 of the Reading bonds which were issued by the Consolidated Company for stock of the petitioner in 1903 and their value is determined from the book value of petitioner's stock.

That bonds held by one corporation of another corporation are tangible property we admit, and if we should concede further that bonds of the Consolidated Company issued for the petitioner's stock would be an asset in the hands of the petitioner, the bonds would not bring anything of value to the petitioner for invested capital purposes when the Consolidated Company passes from the picture, which was what happened in this case prior to the taxable years on appeal. The only asset back of them was the common stock of the petitioner, which, if it came to the petitioner, would be treasury stock, which we have heretofore said in this opinion, could not serve to increase invested capital while retaining its status as treasury stock.

Consistent with the foregoing, we must hold that the additions to surplus of $28,000 and $52,211.25 set up as assets on account of the preferred stock of the petitioner and Reading bonds of the Consolidated Company, respectively, can not be allowed as assets which would operate to increase the invested capital of the petitioner.

Our next consideration is to value the 6,904 shares of preferred stock of the Brass Company which we have said should be valued for invested capital purposes at the time it came to the petitioner through the reorganization plans in 1911. Much difficulty arises here for the reason that some of this company's assets had been transferred to petitioner's plant prior to 1911 and the earnings attributable to these assets, if any, were reflected in the petitioner's earnings. In other words, there was not in 1911, nor had there been for at least a short time prior thereto any operation of the Brass Company as such. When the stock itself was sold by the Colonial Trust Co. under the indenture in which this stock was pledged as collateral for the issuance of the Brass bonds of the Consolidated Company, the highest bid received therefor was $531.02, sale being made at this price. Prior to the dissolution of the Brass Company in 1913, its plant was sold by the assignee for the benefit of creditors at a public sale on December 27, 1911, and was purchased in the interest of the petitioner, the principal creditor, for $5,000, subject to a mortgage of $12,000. No payment was made of the purchase price, but instead, the plant was conveyed to the petitioner on account of its claim, and in 1912, petitioner sold it for $50,000, the purchaser assuming the mortgage. In the increase in surplus previously referred to on account of securities which had not theretofore appeared on the books of the petitioner, there appears this item:

$340,850 Bonds, Consolidated Hardware Company (National Brass
    and Iron Works Series) and preferred Stock of National Brass
    and Iron Works, based on Manufacturers' Appraisal Company
    Values of August 31, 1911 of $85,976.23 less $12,000 mortgage_____ $72,042.28

This amount is a part of the surplus out of which the stock dividend was declared, and presumably has been considered in computing petitioner's invested capital. Whether the cash value of the assets received in the form of securities affecting the Brass Company—preferred stock of the Brass Company and bonds of the Consolidated Company, National Brass and Iron Works Series—in 1911, or assets of the Brass Company to which a property right vested in the petitioner upon dissolution of the Brass Company in 1913, was greater or less than the amount shown by the foregoing journal entry, we consider the evidence insufficient to show, but since we do know that assets were received in 1911 and 1913, we will not disturb the amount which has apparently been allowed as a result of the merger of the Brass Company with the petitioner.

A similar situation exists with respect to the Keystone Company stock which we have said could be included in petitioner's invested capital at its cash value when acquired in 1911. In connection with the increase in surplus on account of securities there also appears this item:

4,723 shares Keystone Hardware Company stock, based on Manufacturers' Appraisal Company's Values of August 31, 1911 of
$55,514.18_____ $43,698.91

One hundred additional shares of this stock were purchased by the Reorganization Committee for the petitioner at $6 per share, which amount plus the value placed on the 4,723 shares in the foregoing journal entry equals the loss claimed on Keystone stock in 1916, but which was not allowed by the Commissioner until 1918. Again we are without sufficient evidence to increase or decrease this addition to surplus, but on the entire evidence in the case we will leave this part of petitioner's invested capital undisturbed.

This brings us to the final issue in the case, viz., the reduction of invested capital due to an arbitrary increase in surplus in 1912 when good will, patents and trade-marks were charged and surplus credited in the amount of $500,000. The Commissioner in his determination reduced capital stock by this amount which he now admits was erroneous and agrees with the petitioner that the reduction should have been from surplus, the account which was originally credited, but, on the other hand contends that this latter method will not alter his original determination of invested capital. The petitioner, however, insists that when the latter method is followed an operating deficit is created which can not be used to reduce capital paid in.

A reduction in surplus when surplus has been improperly increased in the first instance on account of assets which have not been paid in as contemplated by the statute restores the surplus or deficit to its original condition, and does not give rise to an operating deficit which did not theretofore exist. The reason for the rule, which has been generally applied in an intrepretation of the Revenue Acts of 1917 and 1918, that capital or surplus actually paid in is not required to be reduced because of an impairment of capital in the nature of an operating deficit is based on the proposition that the several acts do not require such a reduction and contemplate that invested capital shall at all times include capital or surplus actually paid in until there has been a liquidation or return of the original investment to the stockholders. In *Appeal of Guarantee Construction Co.*, 2 B. T. A. 1145, we said:

Section 326 of the Revenue Act of 1918 makes no provision for the reduction of invested capital of a corporation by reason of an operating deficit. It provides, and we think with reason, that invested capital shall at all times include capital or surplus actually paid in. Earned surplus and undivided profits,

of course, may vary in amount from year to year. We are of the opinion, therefore, that capital and surplus actually paid in remain part of the invested capital of a corporate taxpayer, except where such capital or surplus has been directly or indirectly returned to the stockholders.

The surplus which was created in this case by setting up good will was not a surplus which arose on account of assets paid in or on account of earnings; it was an improper addition in the first instance, and, therefore, its elimination must serve to reduce invested capital in its entirety, even though a deficit may result from such elimination.

A redetermination should, therefore, be made on the basis of the foregoing, taking into consideration not only the adjustment for the item of $500,000 in the manner set out above, but also the several reductions in surplus, totaling $321,042.98, to the extent adjustment has not already been made therefor, and the treatment of the loss on the Keystone stock on which the parties have reached an agreement.

*Judgment will be entered on 30 days' notice, under Rule 50.*

TRUSSELL, dissenting: I am unable to agree with the conclusion reached in the foregoing opinion and decision. We have here four corporations; three of them operating companies and the fourth a holding company, holding substantially all of the stock of two of the operating companies, while a large majority of the third operating company is held by one of the other operating companies. For many years these corporations had existed in a complexity of stock and security ownership and interrelationship of business and operating transactions. The situation appears to have led to confusion and to financial embarrassments, and finally the four corporations, together with their controlling stockholders, join in the appointment of a reorganization committee. This committee determines that the solution of their difficulties lies in the consolidation of all the four companies into one corporate entity. To bring about this result the reorganization committee, together with the four corporations and their controlling stockholders, enter into a written agreement of consolidation, the general terms of which provided that all the assets of each of the operating companies be inventoried, appraised, and valued, and that all of such assets be thrown together into a single aggregate of physical assets valued in accordance with the appraisal; that the stock and security holders of the three operating companies deposit their stock and securities with the reorganization committee and receive in exchange from such committee the stock of the reorganized consolidated company. In carrying this purpose into effect the reorganization committee selected the charter

of one of the operating companies; caused it to be modified and amended in such manner as to accommodate it to the requirements of the consolidated enterprise. Then, when substantially all the stock and securities of the three operating companies had been deposited with the committee, the stock of the consolidated company was caused to be issued, deposited with the reorganization committee and by such committe distributed to the depositing stock and security owners, thus bringing into existence an entirely new corporate enterprise. The fact that the reorganization committee chose to make use of the charter of one of the old operating companies after having procured its modification and amendment, can not be interpreted to mean that the reorganized enterprise was simply a continuation of the former operating company whose charter was amended and used, nor can it defeat the purpose of the reorganization in effecting its intent to bring into existence a new corporate enterprise. Cf. *Yazoo & M. V. Ry. Co.* v. *Adams*, 180 U. S. 1.

I am of the opinion, under the circumstances shown in the record of this case, that the reorganized and consolidated Reading Hardware Co. acquired, in 1911, a new grant of corporate franchise, separate and distinct from the entity formerly existing under that name, and that the assets of all of the companies constituting the reorganized corporate entity were paid in for stock upon the values fixed by the appraisal of such assets and accepted by the reorganization committee and the controlling owners of all of said companies, and that for the purpose of this action the computation of invested capital must start with the asset values paid in for stock of the consolidated enterprise.