BLACK HILLS POWER AND LIGHT COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20926.   Promulgated June 30, 1950.

*Henry A. Mulcahy, Esq.*, for the petitioner.
*Robert M. Willan, Esq.*, for the respondent.

### OPINION.

MURDOCK, *Judge*: The Commissioner determined a deficiency in excess profits tax of $17,350.95 for the fiscal year ended October 31, 1942, and one of $27,634.26 in the same tax for the following fiscal year. The only issue for decision is the value of property to be included in equity invested capital under section 718 (a) (2) of the Internal Revenue Code as property paid in for stock. The facts are found as agreed upon by the parties in a stipulation.

The petitioner filed its returns for the taxable years with the collector of internal revenue for the district of South Dakota.

General Public Utilities, Inc., herein called General, was a subsidiary of Community Power & Light Company. General was required to divest itself of its business and operations in South Dakota in order to comply with section 11 (b) (1) of the Public Utility Holding Company Act of 1935. The petitioner was incorporated on August 27, 1941, to accomplish the required result. It had an authorized capital of 15,000 shares of 5 per cent cumulative preferred stock, par value $100 per share, and 150,000 shares of common stock, par value $1 per share. The petitioner was to continue the business and operations of General and its subsidiary, the Dakota Power Company.

The petitioner entered into an agreement with General on October 14, 1941, covering the acquisition by the petitioner of the properties in South Dakota. The agreement as amended 10 days later provided, *inter alia*, that all of the properties were to be transferred to the petitioner and in exchange the petitioner was to pay some cash, was to assume some liabilities, and was to issue to General 8,500 shares of the petitioner's 5 per cent cumulative preferred stock and 92,650 shares of the petitioner's common stock.

The petitioner sold its First Mortgage Bonds in the principal amount of $2,000,000 at 103¼ on September 5, 1941, through Dillon, Read & Co.

The petitioner and General entered into an Underwriting Agreement with Dillon, Read & Co., on October 27, 1941, whereby the petitioner sold to the underwriters 7,350 shares of its common stock at $14.60 per share, and General sold to the underwriters 8,500 shares of the petitioner's preferred stock at $96.50 per share and 92,650 shares of the petitioner's common stock at $14.60 per share. The underwriters were to offer the preferred stock to the public at $100 per share and the common stock at $16.50 per share.

The underwriters on October 28, 1941, offered the preferred and common stock to the public at the prices mentioned, and during the next 3 days sold at those prices 1,909 shares of preferred stock and 17,066 shares of common stock. They sold an additional 2,171 shares of the preferred and 31,683 shares of the common at those same prices during the period from November 1 to December 6, 1941. The underwriters had an agreement among themselves intended to support the market so that those prices would be maintained until the agreement was terminated.

The preferred and common stock selling groups formed by the underwriters were terminated on December 20, 1941. The quotations on the securities of the petitioner on that date were 98 asked, for the preferred, and 13 bid, and 13½ asked, for the common.

The petitioner, in its excess profits tax returns for the taxable years, claimed excess profits credits based on invested capital which included $121,275, representing the alleged amount of cash received from the sale of the 7,350 shares to the underwriters, $850,000 representing 8,500 shares of preferred stock "issued for property at $100 per share" and $1,528,725 representing 92,650 shares of common stock "issued for property at $16.50 per share."

The Commissioner, in determining the deficiency, held that $14.60 was the amount of cash paid for each of the 7,350 shares sold to the underwriters and the petitioner now concedes that that is correct. The Commissioner also held that the equity invested capital to which the petitioner is entitled on account of the issuance of the 8,500 shares of preferred and the 92,650 shares of common was $2,172,940. In other words, he allowed $96.50 of equity invested capital for each share of preferred issued to General and $14.60 for each share of common issued to General, which shares were then sold by General to the underwriters at those prices.

The only question for decision is the amount of equity invested capital to which the petitioner is entitled on account of the issuance of the 8,500 shares of preferred stock and the 92,650 shares of common. Section 718 (a) provides that equity invested capital shall include money paid in for stock and also property other than money paid in for stock.

The Commissioner first argues that the several transactions involving the acquisition of the properties by the petitioner, the issuance of its stock by the petitioner, and the sale of that stock by the underwriters were all a part of an integral plan so that the equity invested capital is determined by the amount of cash which the underwriters paid in for the stock rather than by the value of the property which the petitioner received from General. The thought is that General did not pay in property for this stock but the underwriters paid in cash for it. The stipulated facts show, however, that General actually transferred property to the petitioner for the stock in question and became the owner of that stock and that the petitioner never received the cash paid by the underwriters to General for the stock. Apparently that was necessary so that General could pledge that stock and thus have its properties released from the lien of a mortgage, but, in any event, it does not appear that the issuance of the stock to General lacked business purpose. The plan contemplated the sale of the stock by General to the underwriters, and perhaps that was necessary in order to comply with the Public Utility Holding Company Act. Nevertheless, the step whereby General transferred properties to the petitioner for the petitioner's stock can not be ignored for the purpose of section 718 (a). Cf. *Hazeltine Corporation* v. *Commissioner*, 89 Fed. (2d) 513, 519. Since property was actually paid in for the stock, that property must be included in equity invested capital "in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange." Section 718 (a) (2), Internal Revenue Code.

The Commissioner concedes that that basis is the cost of the property. The cost of the property is the value of the shares issued for the property, so the question is what was the value of those shares. The value of the property turned in would be evidence of the value of the shares, but there is no direct evidence as to that value. The petitioner contends that the value of the preferred stock was $100 per share and the value of the common was $16.50 per share because quantities of those shares were promptly sold by the underwriters at those prices. The Commissioner contends, on the other hand, that the best evidence of the value of the shares was the price at which they were sold to the underwriters. He points out that the underwriters did not sell all of their shares and the market price dropped as soon as their support was withdrawn. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, each reasonably informed as to the facts and neither acting under any compulsion. Sales on an established market are regarded as proper evidence of fair market value provided the market is free and open and not subject to any influence which might prevent it from being a true reflection of value. The petitioner in

this case does not suggest that either it or General was acting under any compulsion in making sales to the underwriters, although the situation was forced upon General and it may have been acting under some compulsion when it sold the stock of the petitioner to the underwriters. The Commissioner argues that the market was "rigged" in that the underwriters had agreed to support it. However, there is no evidence in the record that the underwriters actually bought shares to support the market. The Commissioner would have the Court take judicial notice of the fact that the underwriters purchased 215 shares of common on November 27, 1941, at $16.50 per share and that on 4 days in December 1941, beginning on the 22d, 920 shares were purchased at prices ranging from 13⅛ to 13⅞. Obviously, the latter purchases were not made in accordance with the agreement of the underwriters because their agreement was terminated on December 20th of that year. The other purchases are relatively insignificant. The record shows that the underwriters sold a considerable quantity of the shares, but it does not show that they sold all of the shares received from General, and it is important to determine here the total value of 8,500 shares of the preferred and 92,650 of the common. The evidence leaves doubt that the value of those shares as a whole was as high as the prices at which the underwriters sold some of them shortly after they bought them from General. The petitioner argues that the falling off of the price after the underwriting agreement was terminated was due to the intervention of war on December 7, 1941. The Court, taking into consideration all of the evidence, including the sales by General and the petitioner to the underwriters, the circumstances surrounding those sales, the sales by the underwriters to the public and the circumstances surrounding those sales, together with all of the other evidence in the record which sheds any light on the subject, has come to the conclusion that the basis of the property paid in by General for the 8,500 shares of preferred and the 92,650 shares of common was $2,280,000.

Reviewed by the Court.

*Decision will be entered under Rule 50.*