NATIONAL BANK OF COMMERCE OF NORFOLK, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 2268.

United States District Court
E. D. Virginia,
Norfolk Division.

Feb. 4, 1958.

Charles L. Kaufman and William P. Oberndorfer, Norfolk, Va., for plaintiff.

L. S. Parsons, Jr., U. S. Atty., William F. Davis, Asst. U. S. Atty., Norfolk, Va., Charles K. Rice, Asst. Atty. Gen., James P. Garland and Gerard J. O'Brien, Attys., Dept. of Justice, Washington, D. C., for defendant.

HOFFMAN, District Judge.

Plaintiff has instituted this action seeking the recovery of federal income and excess profit taxes, together with interest thereon, assessed and collected from plaintiff for the calendar years 1950 and 1951, in the aggregate principal sum of $22,306.87.[1]

Section 113(a) (7) of the Internal Revenue Code of 1939 (26 U.S.C.A. § 113) provides that the tax consequences arising out of prior year reorganizations shall, for the years after December 31, 1917, and before January 1, 1936, be treated on the basis of the cost of property for purposes of computation of gain or loss; but it is further stated that if the property was acquired by the transferee corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property to the extent of 50 per centum or more remained in the same persons or any of them (transferors), then the basis would be the same as it would be in the hands of the transferor.

For the tax years in controversy, plaintiff computed its excess profits tax liability on the basis of invested capital, including in said item the sum of $500,-

---

.1. While this is the amount stated in the complaint, counsel have agreed that the computation is subject to verification.

000, which plaintiff contends was the amount paid in stock for the good will (deposits) of a state bank known as the Trust Company of Norfolk on January 7, 1927. The taxable status of this item of good will is the factor for ultimate determination.[2]

Plaintiff is a national banking association, engaged in the banking business in the City of Norfolk, Virginia, and is the same association as Norfolk National Bank of Commerce and Trusts; the latter organization having been formed in 1927 and its name changed in 1933 at the time of a subsequent consolidation with the Virginia National Bank. For convenience the plaintiff will hereafter be referred to as the "Consolidated Bank". During the year 1926, three banks—two national and one state— were operating independently of each other in the City of Norfolk. The two national banks, The National Bank of Commerce of Norfolk (hereinafter referred to as "Commerce") and The Norfolk National Bank (hereinafter designated as "Norfolk National"), together with the Trust Company of Norfolk (hereinafter called "Trust Company"), formulated a Plan to organize the Consolidated Bank. While the details of the Plan were necessarily involved, it is sufficient to state that the documentary evidence reveals in substance three distinct operations as follows:

(1) Commerce and Norfolk National were to be consolidated in accordance with the applicable provisions of the National banking statutes and with the approval of the Comptroller of the Currency. It is conceded that this transaction, standing alone, brought about a direct nontaxable reorganization, with the two national banks being consolidated under the charter of Commerce as modified by the Agreement of Consolidation.

(2) Immediately prior to the effective date of the aforesaid consolidation, Commerce and Norfolk National were to acquire the good will of the *Trust Department* of the Trust Company for $200,-000 *in cash*, of which amount $120,000 was to be paid by Commerce and $80,000 by Norfolk National.

(3) Immediately after the effective date of said consolidation, the Consolidated Bank was to acquire certain of the tangible assets of the Trust Company, as well as its good will evidenced by its bank deposits, in consideration of—

(a) The Consolidated Bank assuming the Trust Company's liabilities to its depositors;

(b) The issuance and sale of 5,000 shares of common stock in the Consolidated Bank (same being 20% of the total common stock issued) to be distributed ratably to the shareholders of the Trust Company; and

(c) The assumption by the Consolidated Bank of the unexpired leases on the banking quarters of the Trust Company, where the Consolidated Bank did thereafter operate branches for a period of time (such leases were, of course, executory in nature and are hardly pertinent to the issues now presented).

The consolidation of the two national banks was confirmed and approved by the Acting Comptroller of the Currency effective January 7, 1927. Immediately prior to the consolidation, Commerce and Norfolk National acquired, for the aggregate sum of $200,000 in cash the good will of the trust and fiduciary business in the *Trust Department* of the Trust Company. In conformity with the rulings of the Comptroller of the Currency which do not allow good will to be carried as an asset on the books of a national bank, the good will thus acquired was charged off the books of Com-

2. For the tax years 1941 to 1945, both inclusive, plaintiff included the sum of $525,000 as an item for invested capital in reporting its excess profits tax liability. The item was never contested by the Government and the evidence discloses that, for the year 1945, the claim of good will by way of invested capital would have made a difference in the tax liability. The figure of $525,000 was reduced by counsel for plaintiff to $500,000 in order to correspond with a stock valuation of $300 per share.

merce and Norfolk National. As to this item, the Government freely concedes that the acquisition of the good will of the *Trust Department* was a *bona fide* purchase and has permitted the inclusion of $200,000 in plaintiff's invested capital for the purpose of computing its excess profits tax liability for the two years in question.[3]

The Plan contemplated capital contributions of $5,000,000 in the Consolidated Bank, with $2,500,000 being credited to the capital account representing the par value of 25,000 shares of its stock, and the remaining $2,500,000 being credited to its surplus and undivided profits account. The assets contributed by each national bank were subject to acceptance by a committee of six (three from each bank) and approved by the Comptroller of the Currency. The net assets over liabilities contributed by Commerce aggregated $2,400,000, and the net assets over liabilities contributed by Norfolk National amounted to $1,600,000; thus making a total contribution of $4,000,-000 by the two national banks. In order to complete the capital structure of $5,-000,000, the remaining $1,000,000 was to be forthcoming from the stockholders of the Trust Company.

As previously noted, the Consolidated Bank was to have capital consisting of 25,000 shares of $100 par value common stock. Shareholders of Commerce were to receive 12,000 shares in the Consolidated Bank on a share for share basis, in exchange for their outstanding stock, to bring about their total holding of $2,400,000. Shareholders of Norfolk National were to receive 8,000 shares, issued at the rate of 8/10ths of a share for a share, in exchange for their outstanding stock to bring about their total holding of $1,600,000. The remaining 5,000 shares of the Consolidated Bank were to be sold for cash at $200 per share to the shareholders of the Trust Company, which was the equivalent of receiving one-half share of stock in the Consolidated Bank for each share of stock of the Trust Company.

The assets of each national bank and the state bank which were not acceptable to the committee of six and the Comptroller of the Currency, or were otherwise not required as a part of the capital contributions, were distributed to their respective shareholders or turned over to Liquidating Trustees for liquidation and ultimate distribution to such shareholders. In fact, shortly prior to consolidation, Norfolk National made a special cash distribution to its shareholders in the sum of $25 per share, aggregating $250,000.

From the foregoing pattern it will be noted that the shareholders of all three banks were at least intended to be treated with equality in the distribution or sale of the stock issue of the Consolidated Bank. A figure of $200 per share was used throughout. Where a corporation issues stock in payment of assets, it is well settled that the market value of the stock at the time of issuance determines the cost basis of the assets to the acquiring corporation. *Irving Trust Co. v. United States,* 30 F.Supp. 696, 702, 90 Ct.Cl. 310; *Merchants National Bank v. Commissioner,* 6 B.T.A. 1167; *Independent Oil Co., Inc.,* 6 T.C. 194; *Black Hills Power & Light Co.,* 14 T.C. 1425. In the case at bar considerable testimony was introduced by plaintiff to establish the market value per share of the stock in the Consolidated Bank at the time it acquired certain assets of the Trust Company and, during the course of trial, the Government *stipulated* that the stock had a market value of $300 per share. As the Consolidated Bank acquired from the Trust Company certain tangible assets having a value of $1,000,-000 in excess of the assumed deposit liabilities, and as it issued stock at the time having a valuation, as per stipulation, in the sum of $1,500,000, the Con-

---

3. This position is a bit inconsistent with the attitude now taken by the Government. While it is true that the sale of this item of good will was to the separate national banks prior to the effective date of the consolidation, it was nevertheless a part and parcel of the overall Plan.

solidated Bank contends that the difference of $500,000 represented what was paid in stock for the good will of the banking deposits of the Trust Company.

Bank deposits are generally recognized as the life-blood of a banking institution. They have a substantial going-concern value which cannot be carried on the books as such. In the Norfolk area, at the time in question, it was fairly well established at approximately ten per cent of the total amount of deposits; the total deposit liabilities of the Trust Company being $5,781,155.56. In larger metropolitan areas it is known that bank stocks have sold as high as two or three times the book value of the stock, the reason being attributed to the good will value of the deposits.

Much has been said concerning the fact that checks were never actually issued in payment of the stock of the Consolidated Bank issued to the shareholders of the Trust Company. While this transaction was treated as a purchase for cash by the Consolidated Bank, the entire matter was handled in the form of bookkeeping entries. The Plan itself called for "cash", as the law required that stock in a national bank must be paid for in cash. The shareholders of the Trust Company had the right to demand cash for the sale of its stock. Clearly, however, it was not contemplated that checks would actually be passed between the parties. If checks had been issued in payment of the assets, they would have been endorsed immediately and used in payment of the stock. The ultimate result, in any event, was a cash transaction. Furthermore, the minutes of the stockholders of the Trust Company reveal that the proceeds of the sale of the assets and the loans obtained by the Liquidating Trustees were to be distributed as liquidating dividends to stockholders to enable said stockholders to acquire the stock of the Consolidated Bank. A power of attorney executed by the stockholders of the Trust Company authorized (1) the receipt of a liquidating dividend of $100 per share, (2) the purchase at $200 per share of the capital

stock in the Consolidated Bank in an amount equal to one share for each two shares of Trust Company stock, and (3) the application of the amount received by way of liquidating dividend in payment of said stock in the Consolidated Bank.

The total assests transferred by the Trust Company to the Consolidated Bank, and deemed acceptable by the committee of six, aggregated $6,081,155.56 as of January 7, 1927. Total liabilities of the Trust Company to its depositors was $5,781,155.56, which were assumed by the Consolidated Bank. As noted, the excess of acceptable assets over assumed liabilities amounted to $300,000 for which no check was ever issued by the transferee as it was applied on account of the $1,000,000 due for the sale of 5,000 shares of stock at $200 per share. The balance of $700,000 was raised in the manner hereinafter described.

The committee of six, together with the national bank examiners, rejected certain assets of the Trust Company in the form of time loans, demand loans and investments. The rejected assets had a book value of $1,697,226.17. While it was originally anticipated that the acceptable assets would exceed assumed liabilities by as much as $500,000 (rather than $300,000), the Plan required modification in order to supply the additional $200,000. The segregated or unacceptable assets were transferred to the Liquidating Trustees of the Trust Company, who were, in turn, authorized to pledge these assets to secure a loan of $500,000 from the Consolidated Bank. In order to secure the additional $200,000, the Trustees placed a second or subordinate lien on the pledged assets, accompanied by an underwriting agreement executed by 12 stockholders of the Trust Company in the form of a limited guaranty, which loan was also made by the Consolidated Bank. The excess of acceptable assets over assumed liabilities, plus the aggregate of the aforesaid two loans, made up the total capital contribution of $1,000,000. The evidence reveals that economic

conditions existing in 1928, 1929 and 1930 brought a decided depreciation in these unacceptable assets, resulting in the payment in full of the $500,000 loan (plus interest) from the pledged assets, but the $200,000 loan was substantially paid as to principal from the personal funds of the underwriters. In any event, both loans were paid in full to the Consolidated Bank.

Whatever may have been the device used to consummate the transaction and the method employed by the Trust Company stockholders to obtain the funds to purchase the 5,000 shares of stock in the Consolidated Bank, several matters are beyond dispute, namely, (1) the Plan and all legal documents refer to a *purchase* of the Trust Company assets, (2) the market value of the stock issued by the Consolidated Bank was admittedly $300 per share, (3) the Consolidated Bank acquired tangible assets of the Trust Company having a value of $1,000,000, for which it issued its stock having a market value of $1,500,000, (4) the net cost of acquiring the assets of the Trust Company was $1,500,000, and (5) the only logical explanation of the $500,000 differential is in the good will of the deposits of the Trust Company, the Plan having contemplated the ultimate transfer of all of the good will to the transferee.

One final point with respect to the facts. The Plan suggests that the Trust Company would be dissolved at an early date following the purchase and sale described above. Actually the shell of the corporation known as the Trust Company continues to exist to this day by reason of the payment of the annual franchise tax to the State Corporation Commission of Virginia. The evidence is undisputed, however, that the Trust Company ceased to exist as a banking institution on January 7, 1927. Whatever good will existed was transferred as of that date. Certainly if the legal formality of dissolution should be finally accomplished in 1958, it could not be successfully contended that any good will existed as of this date. There were cogent reasons for continuing the corporate shell in existence after January 7, 1927. For one thing, the Trust Company was the named trustee under many deeds of trusts and/or mortgages which required corporate action to release the same of record. Additionally, it is a known fact that the corporate name is protected from use by others as long as the annual franchise tax is paid with regularity. While the Plan provides that "as promptly as practicable after the proposed consolidation becomes effective, it is proposed that the Trust Company of Norfolk be dissolved so that its entire good will may be vested and continued in the Consolidated Bank", it is necessary to look through the form to the substance in ascertaining when the good will actually passed to the Consolidated Bank. The quoted language in the Plan lends force to plaintiff's argument that the good will as evidenced by the deposits was a factor in bringing about the purchase and sale of the Trust Company assets and tends to justify the cost basis to the Consolidated Bank as now urged by the latter.

Excess profits taxes were unknown at the time of this transaction. Tax avoidance was far from the minds of those originating the Plan. All of the details were fully reported to the Comptroller of the Currency, and the transaction between the Consolidated Bank and the Trust Company had a taxable status at all times. Much is made of the fact that the Trust Company reported the sale of its good will of the Trust Department for the sum of $200,000, but failed to report the sale of its good will in its bank deposits. Whatever may have been the errors of the Trust Company and its accountants, the same are not chargeable to the Consolidated Bank as its cost of acquisition of the assets is fixed at $1,500,000. Nor is it of great moment that the Consolidated Bank took over the operating personnel, including the officers, of the Trust Company. A uniting of business interests admittedly took place, but the important question is whether there was a duly qualified nontaxable "reorganization" under the law.

The Revenue Act of 1926, c. 27, 44 Stat. 9, provides as follows:

"Sec. 202. (a) Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in subdivision (a) or (b) of section 204, and the loss shall be the excess of such basis over the amount realized.

"(b) In computing the amount of gain or loss under subdivision (a)—

\* \* \* \* \* \*

"(c) The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

"(d) In the case of a sale or exchange, the extent to which the gain or loss determined under this section shall be recognized for the purposes of this title, shall be determined under the provisions of section 203.

\* \* \* \* \* \*

"Sec. 203. (a) Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 202, shall be recognized, except as hereinafter provided in this section.

"(b) (1) \* \* \*

\* \* \* \* \* \*

"(3) No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

\* \* \* \* \* \*

"(h) As used in this section and sections 201 and 204—

"(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of \* \* \* sub-stantially all the properties of another corporation), \* \* \*."\*

. We have in this case a situation in which the Consolidated Bank took precaution to avoid the effects of a true merger or consolidation as to the Trust Company transaction, which would carry with it an assumption of certain contingent or unknown liabilities. The Trust Company had operated an extensive mortgage and investment business in making mortgage loans or buying securities, and then proceeding to sell these mortgage loans or securities to the general public. The contingent liability of negligence or conversion in handling such transactions was all too obvious and the Consolidated Bank did not wish to assume the potential risk presented by a true consolidation or merger.

The ultimate question for determination is whether the transaction between the Trust Company and the Consolidated Bank comes within the definition of a "reorganization" within Sec. 203(h) (1) where it is said that such a term means "a merger or consolidation (including the acquisition by one corporation of \* \* \* substantially all the properties of another corporation)." The parenthetical clause demands an extended discussion of the law and facts.

Total assets of the Trust Company amounted to $7,778,381.73, of which figure $6,081,155.56 were accepted (slightly in excess of 78%). Rejected assets left with the Liquidating Trustees aggregated $1,697,226.71 (slightly less than 22%). The Government argues that the retained assets ultimately realized only slightly in excess of $500,000, and on this basis the transferred assets represented approximately 92% of the total market value of the Trust Company assets. The difficulty with this theory is that it presupposes the parties could anticipate the economic conditions facing our nation during the period immediately prior and subsequent to the financial crisis confronting the country in 1928 and 1929. Furthermore, in devaluating

* Now 26 U.S.C.A. (I.R.C.1954) §§ 1001, 1002, 361, 368.

the transferred assets by approximately $500,000, as apparently was done by the Comptroller, it would be palpably unfair to devaluate the retained assets to point out the "acquisition of substantially all the properties" without giving like consideration to the depreciation of assets transferred. The only equitable basis to apply is the then fair market value of the total assets, but applying a reduction to both the transferred and retained assets (it having been stated that the amount realized from the latter was between $650,000 and $700,000), the percentage of assets acquired would be approximately 81%.

In ascertaining what is meant by "substantially all the properties", the leading case on the subject appears to be Smith v. Commissioner, 34 B.T.A. 702, 705, wherein it is said:

"We think it unnecessary to decide whether the quoted phrase refers to the gross value of the assets or such value less liabilities. Whether the properties transferred constitute 'substantially all' is a matter to be determined from the facts and circumstances in each case rather than by the application of any particular percentage."

In Milton Smith the transferred assets had a value of $133,374 and the retained assets aggregated $52,082, but these retained assets were for the purpose of satisfying the transferor's liabilities of $45,956. In other words, after the payment of liabilities there remained only approximately $6,000 not transferred. The Board correctly held that this was tantamount to a transfer of "substantially all the properties". Milton Smith refers to David Gross, 34 B.T.A. 395, in which the Board held that a transfer of 80% of the assets (after allowing for the payment of liabilities) did not constitute "substantially all". The decision emphasizes the fact that where assets are retained for the sole purpose of liquidating liabilities, the liabilities must be first satisfied from the retained assets before ascertaining whether "substantially all the properties" were transferred. In the

case at bar, the retained assets of the Trust Company amounting to approximately $1,700,000 were not held for the purpose of paying any existing or known liability.

The doctrine as pronounced in Milton Smith has very recently been approved by the Commissioner of Internal Revenue (Rev.Rul. 57–518, I.R.B. November 12, 1957) and, while this ruling is nor per se applicable to a transfer in 1927, it lends force to plaintiff's argument. The tests as prescribed by the Commissioner are succinctly stated as follows:

"Among the elements of importance that are to be considered in arriving at the conclusion are the nature of the properties retained by the transferor, the purpose of the retention, and the amount thereof."

And in considering Milton Smith, supra, the Commissioner makes this pertinent comment:

"The court very definitely indicated that a different conclusion would probably have been reached if the amount retained was clearly in excess of a reasonable amount necessary to liquidate liabilities."

The "nature of the properties retained" by the Trust Company were ordinary business assets from the standpoint of both the transferor and transferee. The purpose of the retention was not to pay any debts—there were no known unassumed liabilities—but to make a distribution to the shareholders. True, a portion of this retention was required by action of the Comptroller and the committee of six, but even in the Plan as originally devised it was contemplated that the retained assets would be in excess of $1,400,000.

Manifestly, if a similar set of facts were now presented to the Commissioner for the purpose of securing a ruling to the effect that such a transaction constituted a nontaxable reorganization, the Commissioner would be required to give a negative answer to the taxpayer. If incorrect in this assumption, it may be safely said that the Government would

lose substantial tax revenues from the consequences of such action.

Further consideration of the percentage basis of transfer of assets leads to a summarization of other decided cases and rulings. In Pillar Rock Packing Co. v. Comm., 9 Cir., 90 F.2d 949, 950, the court held that a transfer of 68% of all of the assets was not the equivalent of "substantially all the properties". The percentage transfer of 75% of the assets was not tantamount to "substantially all" in I.T. 2373, VI–Cum.Bull. 19 (1927). The Government relies upon Britt v. Commissioner, 4 Cir., 114 F.2d 10, wherein a transfer of 92% of the total assets of the transferor corporation was said to be "substantially all". The importance of the Britt decision from this Circuit is recognized, but it should be noted that Britt was decided under the rule in Helvering v. Elkhorn Coal Co., 4 Cir., 95 F.2d 732, 734 which obligated the Circuit Court of Appeals to follow the "Board's findings of evidentiary facts". See Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248. The Dobson rule was rescinded by statute in 1948, and now appears in § 7482 of the Internal Revenue Code of 1954. Since 1948 determinations by the Board of Tax Appeals or Tax Court are reviewable "in the same manner and to the same extent as decisions of the District Courts in civil actions tried without a jury." While the transaction in controversy took place in 1927, the tax assessment was made for the years 1950 and 1951 and the Dobson rule is no longer applicable. This undoubtedly weakens the effect of Britt v. Commissioner, supra, and it remains to be seen what the Circuit Court of Appeals would do in the same case if presented to it in light of the present statutory provisions.

One of the leading cases on the subject of merger and consolidation is Cortland Specialty Co. v. Commissioner, 2 Cir., 60 F.2d 937, 939, certiorari denied 288 U.S. 599, 53 S.Ct. 316, 77 L.Ed. 975. The language follows:

> "Reorganization, merger, and consolidation are words indicating corporate readjustments of existing interests. They all differ fundamentally from a sale where the vendor corporation parts with its interest for cash and receives nothing more. * * * A merger ordinarily is an absorption by one corporation of the properties and franchises of another whose stock it has acquired. The merged corporation ceases to exist, and the merging corporation alone survives. A consolidation involves a dissolution of the companies consolidating and a transfer of corporate assets and franchises to a new company. In each case interests of the stockholders and creditors of any company which disappears remain and are retained against the surviving or newly created company. * * We believe that the general purpose of them all has been to continue the interests of those owning enterprises, which have been merged or consolidated, in another corporate form."

■■ Undoubtedly the words within the parenthesis of § 203(h)(1) expand the meaning of "merger" or "consolidation" to include certain transactions which partake of the nature of a merger or consolidation, but are beyond the ordinary and commonly accepted meaning of those words. Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428. This is not to say, however, that the uniting of business interests is always of a sufficient nature to qualify as a nontaxable reorganization. Such an interpretation would destroy the effect of Regulation 130, § 40.458–2(b) which provides that: "If the basis to the taxpayer is cost and stock was issued for the property, the cost is the fair market value of such stock at the time of its issuance." The issue is one essentially grounded upon the facts of each case in order to ascertain whether the transfer included substantially all its properties. No one factor is determinative. A series of opinions written by Justice McReynolds and decided on December 16, 1935, emphasize the "continuity of interest" rule, but do

not invoke any doctrine specifying that, where there remained a "continuity of interest", there existed a "reorganization" making the transaction nontaxable. G. & K. Manufacturing Co. v. Helvering, 296 U.S. 389, 56 S.Ct. 276, 80 L.Ed. 291; Nelson Co. v. Helvering, 296 U.S. 374, 56 S.Ct. 273, 80 L.Ed. 281; Helvering v. Minnesota Tea Co., 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284; Helvering v. Watts, 296 U.S. 387, 56 S.Ct. 275, 80 L.Ed. 289; Bus & Transport Securities Corp. v. Helvering, 296 U.S. 391, 56 S.Ct. 277, 80 L.Ed. 292. It is, of course, elementary that there must be a "continuity of interest" in every nontaxable reorganization. Does it follow, however, that a nontaxable reorganization comes into being wherever the stockholders of the transferor corporation acquire a substantial stock interest in the transferee? If such is the rule, any uniting of business interests between corporations will result in a nontaxable reorganization when the stockholders of the transferor corporation acquire any stock interest in the transferee which may be in excess of de minimis.

Tested by these principles, while the question is not entirely free from doubt, it is difficult to state that the transaction of 1927 between the Consolidated Bank and the Trust Company was in the nature of a merger, consolidation or nontaxable reorganization. As to the intent of the parties, the evidence is without contradiction that the officers, directors and stockholders of the three banks each recognized that the accepted assets of the Trust Company constituted a purchase by the Consolidated Bank and a sale by the transferor (state) bank. The only intimation to the contrary is a full-page advertisement appearing in the "Virginian-Pilot and the Norfolk Landmark" on January 12, 1927, which is captioned "The Merger". Advertisements of this nature carry but little legal significance when considered in the light of the formal legal documents, the actions of the parties, and their intentions. Additionally, there was no absorption of the Trust Company as the corporate shell exists even to this date although its good will has long since passed to the Consolidated Bank. Certainly the potential liabilities of the Trust Company were not assumed by the transferee.

Disregarding for the moment the parenthetical clause of § 203(h)(1), it would clearly appear that the transaction in question does not fall within the accepted definition of a merger or consolidation in the legal sense. As is stated in 13 Am.Jur., "Corporations", § 1244, p. 1130:

"If the new corporation succeeds to the assets of the old corporation by virtue of a consolidation, merger or reorganization and not by way of purchase, then the new corporation is liable for the debts and contracts of the old, although there is no statute imposing a liability and no agreement assuming it."

There were, of course, compelling reasons founded upon sound business judgment why the Consolidated Bank did not wish to assume the contingent liabilities arising from the prior operations of the Trust Company's investment activities. The form of the transaction was clearly that of a purchase and sale. Indeed, the substance was of a like vein for it can hardly be contended that the Consolidated Bank assumed any liabilities other than those to the depositors of the Trust Company.

For what light it may throw upon the proper construction to be placed upon the transaction after a period of 30 years, it is fitting to comment that the Comptroller of the Currency must have regarded the now contested phase of the matter as a purchase and sale. He approved the consolidation of the two national banks, but made no reference to the transaction between the Consolidated Bank and the Trust Company, although he was fully advised with respect to the details of the Plan. If there had been a consolidation or merger, his approval was a condition precedent to its consummation. The evidence further reveals that the Consolidated Bank applied for and obtained permission from the Comptroller to operate as

branches of three banking quarters previously maintained by the Trust Company. Such action would not have been necessary in the event of a merger or consolidation as permission to operate the branches would follow automatically.

Mention is made of the fact that the Trust Company failed to include the sale of its good will for $500,000 in its tax return filed for the year 1927. At the outset it should be stated that the failure, if any, of the Trust Company to report the sale for tax purposes is not binding upon this plaintiff.[4] Moreover, the Commissioner had full knowledge of all the facts and figures as to the transaction. Aside from these points, however, at the time the Trust Company prepared and filed its tax return for 1927 the rule in Mullins v. Commissioner, 14 B.T.A. 426, and Brackett v. Commissioner, 19 B.T.A. 1154, was in effect. These cases held that "each step taken pursuant to a plan is to be treated as a separate transaction." This rule has since been repudiated in Heller v. Commissioner, 2 T.C. 371, 384, and the substance of the transaction from beginning to end is now the law. As the additional $500,000 was not paid to the Trust Company in cash, but was transmitted to the stockholders through the medium of stock value, it is at least a matter for argument under the Mullins and Brackett cases whether the transaction was required to be reported. There was no evidence presented with reference to how the individual shareholders of the Trust Company treated the taxable status of the stock in the Consolidated Bank when received by them.

We come perforce to the conclusion that the transaction between the Consolidated Bank and the Trust Company was neither a merger nor consolidation within the intent of § 203(h)(1) of the Revenue Act of 1926; that the transfer of the assets was not the equivalent of the acquisition by the transferee of "substantially all the properties" of the transferor; and that the fair preponderance of all of the evidence leads to the inevitable conclusion that the additional $500,000 was intended to, and did represent, the good will of the deposits of the transferor.

Assuming arguendo that the Government is correct in its contention that the entire transaction was a merger, consolidation, or some other type of nontaxable organization, the defendant has another hurdle to overcome because of the provisions of § 113(a)(7) of the Internal Revenue Code of 1939. This section establishes the basis of property at cost, subject to certain exceptions of which only subsection (7) is pertinent. The latter relates to property acquired in a reorganization and reads substantially in the language set forth in the second paragraph of this opinion.

There can be no doubt that Commerce and Norfolk National were consolidated under the charter of Commerce. In Irving Trust Co. v. United States, supra, there is a complete discussion of the distinctions between a merger and a consolidation as the same applies to § 113(a)(7). In a merger between two existing corporations, there is only one transferor, whereas a consolidation of two or more corporations in which a new corporation is formed gives rise to a transferor status as to each of the old corporations. Hence, in a consolidation and in ascertaining whether or not an interest or control is in the hands of the same persons, it apparently is necessary to look to the interest or control of all the transferors.

Plaintiff insists that the interest of the former shareholders in the Trust Company was only 20%, and that plaintiff may, therefore, compute the acquisition costs of the property obtained by the Consolidated Bank from the Trust Company on the basis of cost to the transferee without regard to costs to the transferor. If we were to treat the transfer from the Trust Company to the Consolidated Bank as an isolated step in the transaction and

4. Fahs v. Florida Machine & Foundry Co., 5 Cir., 168 F.2d 957.

disregard the overall Plan, plaintiff would be correct in its contention. But we do not feel that, for the purpose of construing the applicability of § 113(a)(7), such an interpretation is reasonable.

The consideration of this point is, of course, unnecessary to a determination of this case as the Court has heretofore held that the acquisition of the assets of the Trust Company constituted a purchase by the Consolidated Bank and a sale by the Trust Company. If, however, the Court is in error as to this point, § 113(a) (7) would appear to be applicable and the cost basis would be the same as it stands in the hands of the transferor Trust Company.

In Fairbanks Court Wholesale Grocery Co. v. Commissioner, 7 Cir., 84 F.2d 18, 20, certiorari denied 299 U.S. 582, 57 S.Ct. 47, 81 L.Ed. 428, the court had before it a substantially similar question which, as applied to the instant proceeding, would read:

"Where three separate and distinct corporations are consolidated into a new corporation which issued its entire capital stock for the properties of the former corporations in such proportions that the aggregate stock held in the new corporation by all the former stockholders of any one of the three former corporations was less than 50 per cent. of the outstanding stock of the new corporation, shall the new corporation compute the gain or loss on the basis of the cost of said properties to it (new corporation) without regard to the respective costs to each of the three former corporations?"

In affirming the Board of Tax Appeals, the appellate court gave a negative answer to this inquiry. The facts, assuming arguendo that there existed a consolidation or nontaxable reorganization of the three corporations, are strikingly similar. The new corporation issued 42% of its stock to the stockholders of A corporation, 40% to the stockholders of B corporation and 18% to the stockholders of C corporation. The court said:

"The parties collectively now owning the consolidated properties are the identical parties who owned 100 per cent. of that property before consolidation."

To the same effect is Monarch Electric & Wire Co. v. Commissioner, 7 Cir., 38 F.2d 417, and MacLaughlin v. Harr, 3 Cir., 99 F.2d 638.

Accordingly, if the transaction between the Trust Company and the Consolidated Bank may properly be classified as a consolidation or nontaxable reorganization, the exception as stated in § 113(a)(7) would appear to be applicable and the cost basis, in that event, would be the same as it stands in the hands of the Trust Company. If the transfer in question be deemed a merger, the evidence discloses that the combined interests of the shareholders of Norfolk National and the Trust Company is 52% of the capital, to the end that immediately after the transfer an interest or control in the property to the extent of 50% or more remained in the transferors. The only manner in which the plaintiff could prevail on this point would be to treat the consolidation or merger of the two national banks as a separate and distinct step from the acquisition of the Trust Company assets. It is, therefore, immaterial to consider whether a new corporation was actually formed or whether there had been a legal merger of the national banks.

After proper computation of the amount due to said plaintiff by reason of this action, counsel for the taxpayer shall prepare a judgment order in accordance with this opinion, which is adopted by the Court in lieu of specific findings of facts and conclusions of law, and, following presentation of said order to opposing counsel for inspection and endorsement, the same shall be presented to the Court for entry.